MOORE v DETROIT ENTERTAINMENT, LLC

Docket No. 275157. Submitted April 8, 2008, at Detroit. Decided May 27, 2008, at 9:05 a.m. Leave to appeal sought.

Douglas Moore brought an action in the Wayne Circuit Court against Detroit Entertainment, L.L.C., doing business as Motor City Casino, and Jose O. Martinez, a casino security manager licensed as a private security officer under MCL 338.1079, alleging various intentional torts under state law and a violation of 42 USC 1983, which states that any person who experiences the deprivation of any rights, privileges, or immunities secured by the United States Constitution and laws because of the actions of another person acting under color of any statute, ordinance, regulation, custom, or usage of any state may file an action seeking relief against the party that caused the deprivation. The plaintiff had been denied entry into the casino on the basis of his alleged inebriation. He then left the premises after he was accused of assaulting Martinez. Several of the casino's security personnel, some of whom were licensed under MCL 338.1079, along with two Detroit police officers, confronted the plaintiff off the casino's premises and offered him the choice of returning to the casino to discuss the alleged assault or placing himself in the custody of the Detroit Police Department. The plaintiff elected to allow himself to be escorted back to the casino's security office, where he was detained in a locked room for about 2½ hours until he signed a form that permanently banned him from the casino. He was subsequently arrested as a result of warrants alleging assault and battery, and was acquitted of the charges in a jury trial in the 36th District Court. At the conclusion of a jury trial of the plaintiff's action in the Wayne Circuit Court, the jury returned a special verdict in favor of the plaintiff, and the court, Michael J. Callahan, J., entered a judgment consistent with the verdict. The casino appealed various aspects of the judgment, including the ruling that the casino, through the conduct of its security officers licensed under MCL 338.1079, acted under color of state law in detaining the plaintiff. The plaintiff cross-appealed from the court's pretrial order that granted summary disposition for the defendants on the plaintiff's claims of abuse of process and malicious prosecution.

The Court of Appeals *held*:

1. The determination whether private security police officers acted under color of state law for purposes of an action under 42 USC 1983 must be based on the facts of each specific case. Here, the facts show that the licensed private security officers acted under color of state law in detaining the plaintiff. The casino's employees arrested and detained the plaintiff because they suspected that he had committed an assault and battery. Those employees' ability to arrest the plaintiff derived solely from their special state licensure. Detroit police officers expressly approved the actions of the casino's employees, who exercised powers traditionally exclusively reserved to the state and did so with the encouragement and approbation of the state.

2. The holding in this matter is entirely inconsistent with the notion that licensed, private security guards are always state actors or that the mere performance of a task specifically authorized by a state statute confers state-actor status. The mere fact that a business is subject to state regulation does not by itself convert its action into that of the state for purposes of the Fourteenth Amendment.

3. A succinct principle that aids in the analysis of the state-action requirement in § 1983 cases is that the court must ask whether the state provided a mantle of authority that enhanced the power of the harm-causing individual actor. Here, the state provided a mantle of authority that constrained the plaintiff to subject himself to detention.

4. The defendants' joint engagement with the Detroit police in the arrest and detention of the plaintiff satisfies the symbiotic relationship or nexus test of action under color of state law.

5. The jury's rejection of the plaintiff's false-arrest claim does not alter the fact that the casino's security officers restricted the plaintiff's freedom of movement for 2½ hours on the basis of the authority provided to them by MCL 338.1080. The licensing statute, MCL 338.1079, provided the mantle of authority for the casino's security personnel, and imbued them with virtually the same powers as the Detroit police officers who explicitly approved the decision to escort the plaintiff back to the casino.

6. The trial court correctly distinguished this case from *Grand Rapids* v *Impens*, 414 Mich 667 (1982), on the basis of the facts involved in both cases.

7. The trial court did not err in denying the defendants' motions for a new trial based on alleged defective jury instructions or inconsistent special verdicts by the jury. The verdicts were not inconsistent.

8. The trial court properly denied the defendants' motion for a directed verdict of the plaintiff's false-imprisonment claim. The jury received proper instructions regarding the claims of false arrest, false imprisonment, and the concept of probable cause necessary to render a search or seizure reasonable and lawful.

9. The jury's award of noneconomic compensatory damages was supported by the evidence. The defendants' request for remittitur regarding that award was properly denied.

Affirmed.

O'CONNELL, P.J., dissenting, stated that the trial court erred by failing to follow the Supreme Court's decision in *Impens* because the logic behind that decision is controlling and dispositive of the issue whether the private security guards were acting under color of state law. *Impens* impliedly determined that private security guards are not state actors simply because they are certified under MCL 338.1079. MCL 338.1080 provides for a limited power of arrest to those security guards licensed under MCL 338.1079. Because the power to arrest under MCL 338.1080 is conferred solely by licensure under MCL 338.1079, if licensure alone does not constitute state action, then acknowledgement that licensure confers an arrest power is similarly insufficient. Here, the security guards never exercised any power to arrest. The mere existence of arrest authority under MCL 338.1080 did not confer state-actor status on the security officers. *Romanski v Detroit Entertainment, LLC,* 428 F3d 629 (CA 6, 2005), is inapplicable to this case and does not control the determination of the plaintiff's claim under 42 USC 1983. The decision of the trial court, which was based on *Romanski*, should be reversed.

CIVIL RIGHTS — STATE ACTION — LICENSED PRIVATE SECURITY OFFICERS.

The determination whether actions of a state-licensed private security officer are actions under color of state law for purposes of a claim under 42 USC 1983 is a fact-specific determination; state action may be found in the exercise by a private entity of powers traditionally exclusively reserved to the state; of assistance in the analysis of the state-action requirement in § 1983 cases is a determination whether the state provided a mantle of authority that enhanced the power of the harm-causing individual actor; to act under color of state law does not require that the defendant be an officer of the state, it is enough if the defendant is a willful participant in joint action with the state or its agents.

*Gary R. Blumberg, P.C.* (by *Gary R. Blumberg*), and
*Warner Norcross & Judd LLP* (by *John J. Bursch* and
*Gaëtan E. Gerville-Réache*) for the plaintiff.

*Garan Lucow Miller, P.C.* (by *Megan K. Cavanagh,
Rosalind Rochkind*, and *Robert F. MacAlpine*), for the
defendants.

Before: O'CONNELL, P.J., and BORRELLO and GLEICHER,
JJ.

GLEICHER, J. Plaintiff commenced this action alleging
multiple state-law intentional torts and a violation of 42
USC 1983 after Detroit Entertainment, L.L.C., doing
business as Motor City Casino,[1] through several casino
employees, denied plaintiff entry into the casino, there-
after detained him inside the casino, and ultimately
banned him permanently from the casino. Defendant
appeals as of right, challenging various aspects of a final
judgment entered by the trial court after a jury trial, at
the conclusion of which the jury returned a special
verdict in plaintiff's favor. Plaintiff cross-appeals, con-
testing the trial court's pretrial order granting sum-
mary disposition of his abuse-of-process and malicious-
prosecution claims. We affirm.

I. UNDERLYING FACTS AND PROCEEDINGS

Plaintiff and five companions traveled to the Motor
City Casino on the evening of September 14, 2002, to
take advantage of a complimentary meal and to gamble.
When the group's Metro car arrived at the casino's valet
entrance, some members of the group, including plain-
tiff, held cups containing alcoholic beverages, but dis-

---

[1] The singular "defendant" in this opinion hereinafter refers to
defendant-appellant Detroit Entertainment.

posed of the cups when advised that they could not enter the casino with them. Much trial testimony disputed whether (1) plaintiff stumbled while alighting from the group's Metro car and approaching the valet lobby, (2) plaintiff's speech was slurred, (3) plaintiff's eyes appeared glassy, or (4) plaintiff's breath smelled of alcohol.

There is no dispute, however, that in the valet lobby, defendant Jose Oscar Martinez, a casino security manager who had obtained "PA 330 certification" under MCL 338.1079,[2] barred plaintiff's entry on the basis that he appeared inebriated and thus constituted a potential liability to the casino. Plaintiff and some of his companions expressed disbelief, denied that plaintiff was intoxicated, and asked to speak with a manager. But the evidence diverged concerning the extent of plaintiff's physical reaction to Martinez's announcement: some testimony described that while protesting his exclusion and demanding a manager, plaintiff may have made "nonchalant" gestures with his arm or hand, although this testimony varied regarding plaintiff's proximity to Martinez at the time of the gestures, while other testimony recounted that plaintiff seemed to have intentionally pointed a finger or directed an open hand that made contact with Martinez's chest. Many witnesses recalled seeing Martinez step backward.[3]

Other nearby casino security personnel announced that an assault had occurred, which prompted plaintiff and his companions to depart from the valet lobby and

---

[2] The "PA 330" shorthand refers to 1968 PA 330, which enacted the current Private Security Business and Security Alarm Act. MCL 338.1051 *et seq.*

[3] Martinez immediately underwent examination by an emergency medical technician, who detected no obvious signs of injury. Martinez did not seek additional medical attention.

walk across the street. A group consisting of several casino security officers, at some point accompanied by two Detroit police officers, eventually confronted plaintiff and his companions. Another PA 330-certified casino security manager, John Grzadzinski, offered plaintiff the choice to either return to the casino to discuss the alleged assault, or to place himself in the custody of the Detroit Police Department. At trial, Grzadzinski replied affirmatively to plaintiff's counsel's inquiry whether the Detroit police officers present likewise "suggested to [plaintiff] that he go back with [Grzadzinski] into the casino, is that right?" Richard Novak, one of plaintiff's companions and his longtime business attorney, recounted at trial that after Grzadzinski announced the two choices "loud enough for everybody to hear," Novak spoke with the Detroit police officers present in the group, and "asked the DPD" whether they agreed with Grzadzinski's two alternative proposals. According to Novak, the officers "said we don't care, it's your call." Plaintiff, who initially declined to return to the casino, ultimately elected, on Novak's advice, to allow himself to be escorted back to the casino's security office.

In a detention room, pursuant to casino policies and applicable administrative rules, plaintiff underwent a pat-down search and the removal and inventory of his personal property, before being left alone in the locked detention room. At plaintiff's request, someone later escorted him to a bathroom. On returning to the detention room, against plaintiff's expressed wishes, security personnel locked him back inside the detention room. Ultimately, Grzadzinski obtained plaintiff's signature on an "86 form" permanently banning him from the casino, although Grzadzinski denied plaintiff's requests that Novak review the form or that plaintiff receive a copy of the form.

The trial evidence established that plaintiff's detention period was about 2½ hours. Plaintiff then left the Motor City Casino with his companions, and everyone went to the Greektown Casino.

In May 2003, a Wayne County Sheriff's deputy arrested plaintiff at Detroit Metropolitan Airport when he learned plaintiff had outstanding assault and battery warrants arising from the September 14, 2002, incident at the Motor City Casino. The criminal proceedings against plaintiff were temporarily terminated in September 2003, when the 36th District Court dismissed the charge without prejudice because no prosecution witnesses appeared. Sometime in 2005, plaintiff discovered the existence of resurrected arrest warrants relating to September 14, 2002. After a December 2005 trial in the 36th District Court, a jury acquitted plaintiff.[4]

II. CHALLENGES TO 42 USC 1983 SPECIAL VERDICT

Defendant first contends that the trial court erred by denying its motion for a directed verdict regarding plaintiff's § 1983 claim. Defendant specifically challenges the trial court's ruling as a matter of law that the casino, through the conduct of its PA 330-certified security officers, acted under color of state law during the September 14, 2002, detention of plaintiff.

A

This Court reviews de novo a trial court's ruling on a litigant's motion for a directed verdict. *Candelaria v B C Gen Contractors, Inc*, 236 Mich App 67, 71; 600 NW2d 348 (1999). In reviewing the trial court's ruling, this Court examines the evidence presented and all legiti-

---

[4] Plaintiff commenced this action in 2004, between the two 36th District Court criminal proceedings.

mate inferences arising therefrom in the light most favorable to the nonmoving party. *Farm Credit Services of Michigan's Heartland, PCA v Weldon*, 232 Mich App 662, 668; 591 NW2d 438 (1998). "A directed verdict is appropriate only when no material factual question exists upon which reasonable minds could differ." *Candelaria, supra* at 71-72. "If reasonable jurors could honestly have reached different conclusions, neither the trial court nor this Court may substitute its judgment for that of the jury." *Hunt v Freeman*, 217 Mich App 92, 99; 550 NW2d 817 (1996). The "appellate court recognizes the jury's and the judge's unique opportunity to observe the witnesses, as well as the factfinder's responsibility to determine the credibility and weight of trial testimony." *Zeeland Farm Services, Inc v JBL Enterprises, Inc*, 219 Mich App 190, 195; 555 NW2d 733 (1996).

B

According to 42 USC 1983, any person who experiences "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" because of the actions of another person acting *"under color of any statute, ordinance, regulation, custom, or usage, of any State"* may file an action seeking relief against the party that caused the deprivation. (Emphasis added.) The dispute in this appeal focuses on the "under color of state law" element of a § 1983 claim.

The United States Court of Appeals for the Sixth Circuit recently examined, in relevant part as follows, the contours of the requisite state-action element:

> The issue in this appeal is whether Plaintiffs can demonstrate that Defendant acted "under color of state law" by showing that Defendant's conduct constituted state action. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 942, 102 S.

Ct. 2744; 73 L. Ed. 2d 482 (1982) . . . . Section 1983 does not, as a general rule, prohibit the conduct of private parties acting in their individual capacities. . . . However, "[a] private actor acts under color of state law when its conduct is 'fairly attributable to the state.' " *Romanski* [*v Detroit Entertainment, LLC*, 428 F3d 629, 636 (CA 6, 2005)] (quoting *Lugar* [*supra* at 937]).

"What [conduct] is fairly attributable [to the state] is a matter of normative judgment, and the criteria lack rigid simplicity." *Brentwood* [*Academy v Tennessee Secondary School Athletic Ass'n*, 531 US 288, 295; 121 S Ct 924; 148 L Ed 2d 807 (2001)]. The Supreme Court and this Court, however, have provided several significant milestones to guide our inquiry as to whether Defendant's conduct constitutes state action. As we recognized in *Chapman* [*v Higbee Co*, 319 F3d 825, 833 (CA 6, 2003),] "[t]he Supreme Court has developed three tests for determining the existence of state action in a particular case: (1) the public function test, (2) the state compulsion test, and (3) the symbiotic relationship or nexus test." Of these three tests, the only one relevant to the instant case is the public function test. Under the public function test, courts have found "state action present in the exercise by a private entity of powers traditionally exclusively reserved to the State." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352; 95 S. Ct. 449; 42 L. Ed. 2d 477 (1974). The Supreme Court has found this requirement satisfied where the state permitted a private entity to hold elections, allowed a private company to own a town, or established private ownership of a municipal park. However, the Supreme Court has explicitly declined to decide the question of "whether and under what circumstances private police officers may be said to perform a public function for purposes of § 1983." *Romanski*, 428 F.3d at 636. [*Lindsey v Detroit Entertainment, LLC*, 484 F3d 824, 827-828 (CA 6, 2007) (some citations omitted).]

C

The trial court in this case invoked *Romanski, supra,* when finding that Martinez, Grzadzinski, and other casino security personnel acted under color of state law

in detaining plaintiff. Because the parties argue at length concerning the propriety of the trial court's application of *Romanski,* we now turn to a careful examination of *Romanski.*

*Romanski* involved a casino patron's claim against the instant defendant. In *Romanski,* the plaintiff, age 72, "took a walk around the gaming floor," during which she "noticed a five cent token lying in a slot machine's tray. Seeing no chair at the machine, she picked up the token and returned to the machine at which she had earlier played, intending to use the token there." *Romanski, supra* at 632. Several casino security officers descended on the plaintiff and advised her that the casino had a "policy not to permit patrons to pick up tokens, which appeared to be abandoned, found at other slot machines, a practice known as 'slot-walking,' " despite the fact that the casino had not posted notice of such a policy. *Id.* at 633. One defendant security officer, Marlene Brown, recalled that because Romanski "became loud and belligerent," several security personnel escorted her to the casino's "small and windowless" security office "located off the casino's floor." *Id.* at 633.

> According to Romanski, once they had taken their seats, Brown accused Romanski of stealing the token, whereupon Brown counted Romanski's money and removed one nickel from Romanski's winnings. [Brown's supervisor JoEtta] Stevenson asked Romanski to turn over her social security card and driver's license; Romanski complied and these items were photocopied. Romanski was then photographed. Romanski testified that she acquiesced to these requests because Brown said she was a police officer, had a badge, and appeared to have handcuffs. . . . [A] uniformed casino security officer stood just outside the room for the duration of the questioning.
>
> Romanski was ejected from the casino for a period of 6 months; Stevenson made the final decision to eject, or "86," Romanski. . . . Although unknown to Romanski at the

time, it is now undisputed that Brown and some of her colleagues on the casino's security staff were licensed under state law as "private security police officer[s]." [MCL 338.1079].[5] By virtue of being so licensed, a private security police officer has "the authority to arrest a person without a warrant as set forth for public peace officers . . . when that private security police officer is on the employer's premises." [MCL 338.1080].[6] The statute additionally

---

[5] In its entirety, MCL 338.1079 provides as follows:

(1) The licensure of private security police shall be administered by the department of state police. The application, qualification, and enforcement provisions under this act apply to private security police except that the administration of those provisions shall be performed by, and the payment of the appropriate fees shall be paid to, the department of state police. The director of the department may jointly promulgate rules with the department of state police under the administrative procedures act of 1969, 1969 PA 306, MCL 24.201 to 24.328, to facilitate the bifurcation of authority described in this subsection.

(2) This act does not require licensing of any private security guards employed for the purpose of protecting the property and employees of their employer and generally maintaining security for their employer. However, any person, firm, limited liability company, business organization, educational institution, or corporation maintaining a private security police organization may voluntarily apply for licensure under this act. When a private security police employer as described in this section provides the employee with a pistol for the purpose of protecting the property of the employer, the pistol shall be considered the property of the employer and the employer shall retain custody of the pistol, except during the actual working hours of the employee. All such private security people shall be subject to the provisions of sections 17(1) and 19(1).

[6] In its entirety, MCL 338.1080 provides as follows:

A private security police officer, as described in section 29, who is properly licensed under this act has the authority to arrest a person without a warrant as set forth for public peace officers in section 15 of chapter IV of the code of criminal procedure, 1927 PA 175, MCL 764.15, when that private security police officer is on the employer's premises. Such authority is limited to his or her hours

requires that private security police officers make arrests only when they are on duty and in "the full uniform of the[ir] employer." *Id.* It is undisputed that Brown was on duty during the events of this case. It is also undisputed that Brown was not wearing the uniform worn by some of the other security guards, but Defendants have never contended that this rendered Brown out of uniform for purposes of [MCL 338.1080]; indeed, *Defendants have conceded from the beginning that the statute applies in this case. Their argument is simply that the power admittedly conferred on Brown by the statute did not make her actions under color of state law. See* 42 U.S.C. 1983. [*Romanski, supra* at 633 (emphasis added).]

The plaintiff filed an amended complaint that contained several state-law tort claims and "a claim under 42 U.S.C. § 1983 that Defendants had violated Romanski's Fourth Amendment rights," specifically "that Defendants, acting under color of state law, had arrested her without probable cause because the token she picked up was abandoned, i.e., not the casino's property." *Romanski, supra* at 634.

When the defendants sought summary judgment of Romanski's § 1983 claim on the basis that they had not acted under color of state law, the district court denied the motion, ruling "as a matter of law that Defendants had acted under color of state law . . . because Brown, the defendant who initiated Romanski's detention, did so while on duty in her capacity as a licensed private security police officer empowered with the same arrest authority as a public police officer." *Romanski, supra* at 635. A jury found in the plaintiff's favor regarding her § 1983 claim that the defendants violated her Fourth Amendment rights, and consequently awarded "$500 in

of employment as a private security police officer and does not extend beyond the boundaries of the property of the employer and while the private security police officer is in the full uniform of the employer.

punitive damages against Brown, and $875,000 in punitive damages against the casino." *Id.* The district court denied a motion for a judgment notwithstanding the verdict, and the defendants appealed. *Id.* at 635-636.

The Sixth Circuit affirmed in *Romanski*, rejecting the defendants' contention that they did not qualify as state actors. The Sixth Circuit commenced its analysis by surveying federal caselaw that had considered whether private security officers acted under color of state law, including *Payton v Rush-Presbyterian-St Luke's Med Ctr*, 184 F3d 623, 627-630 (CA 7, 1999), in which "the Seventh Circuit held that private police officers licensed to make arrests could be state actors under the public function test." *Romanski, supra* at 637. In discussion highly relevant to the instant case, the Sixth Circuit ascertained and applied the following guiding principles:

> [T]he crucial fact in [*Payton*]—assumed to be true there but indisputable here—was that by virtue of their status as on-duty special police officers, licensed by the city of Chicago, the defendants enjoyed "virtually the same power as public police officers." *Id.* at 629. Indeed, the defendants in *Payton* operated under an ordinance which provided that special police officers licensed under it "shall possess the powers of the regular police patrol at the places for which they are respectively appointed or in the line of duty for which they are engaged." *Id.* at 625.
>
> *   *   *
>
> *Payton* illustrates a line that has been drawn in the case law. *The line divides cases in which a private actor exercises a power traditionally reserved to the state, but not exclusively reserved to it, e.g., the common law shopkeeper's privilege, from cases in which a private actor exercises a power exclusively reserved to the state, e.g., the police power.*

Where private security guards are endowed by law with plenary police powers such that they are *de facto* police officers, they may qualify as state actors under the public function test. . . . The rationale of these cases is that when the state delegates a power traditionally reserved to it alone—the police power—to private actors in order that they may provide police services to institutions that need it, a "plaintiff's ability to claim relief under § 1983 [for abuses of that power] should be unaffected." *Payton* [*supra* at 629].

On the other side of the line illustrated by *Payton* are cases in which the private defendants have some police-like powers but not plenary police authority. . . . A subset of these cases are cases in which a private institution's security employees have been dispatched to protect the institution's interests or enforce its policies. The canonical example here is when a store avails itself of the common law shopkeeper's privilege . . . .

Like the district court, we think this case falls on the *Payton* side of the line. It is undisputed that Brown (and some of her colleagues) were private security police officers licensed under [MCL 338.1079]. This means that Brown's qualifications for being so licensed were vetted by Michigan's department of state police, *id.* § (1), and that Brown was subject to certain statutes administered by that department. *Id.* § (2); *see* [MCL 338.1067, MCL 338.1069]. More critical for present purposes are the undisputed facts that Brown was on duty and on the casino's premises at all times relevant to this case. *These undisputed facts lead to an inescapable conclusion of law—namely, that at all times relevant to this case, Brown "had the authority to arrest a person without a warrant as set forth for public peace officers . . . ." [MCL 338.1080.] One consequence of Brown's possession of this authority, the authority to make arrests at one's discretion and for any offenses, is clear: at all times relevant to this case, Brown was a state actor as a matter of law.*

Unlike the common law privileges at issue in *Wade* [*v Byles*, 83 F3d 902 (CA 7, 1996)] (the use of deadly force in self-defense, the right to detain for trespass, and the right

to carry a weapon) and *Chapman* [*supra* at 825] (the shopkeeper's privilege), which may be invoked by any citizen under appropriate circumstances, the plenary arrest power enjoyed by private security police officers licensed pursuant to [MCL 338.1079] is a power traditionally reserved to the state alone. . . .

Defendants contend that *Wade* ought to control here because, as in that case, private security police officers' power to make arrests is subject to spatial or geographic limits. *See* [MCL 338.1080]. But the spatial or geographic limitation in *Wade* was profound—it prohibited housing authority security guards from exercising their (already minimal) powers anywhere except in the lobbies of buildings operated by the housing authority. *See Wade* [*supra* at 906]. By contrast, [MCL 338.1080] invests private security police officers with full arrest authority on the entirety of their employer's premises, which makes this case distinguishable from *Wade* and similar to *Payton* and *Henderson* [*v Fisher*, 631 F2d 1115 (CA 3, 1980)], each of which involved a statute or ordinance that imposed or contemplated some spatial or geographic limits on the private defendants' police powers. *See Payton* [*supra* at 625] (special police officers "shall possess the powers of the regular police patrol *at the places for which they are respectively appointed*") (emphasis added) . . . ; *Henderson* [*supra* at 1117-1119] (authority of the university police was limited to the university campus in question). *Furthermore, as we have discussed, private security police officers in Michigan are endowed with plenary arrest authority, see* [*MCL 338.1080*], while the defendant in *Wade* was permitted to exercise only what were in effect citizens' arrests. [*Romanski, supra* at 637-639 (emphasis added; some citations omitted).]

D

The Sixth Circuit subsequently addressed § 1983 claims filed by several plaintiffs who underwent similar detentions by Motor City Casino security personnel in *Lindsey, supra* at 826. The *Lindsey* court did not

question or criticize the legal principles espoused or the conclusion reached by the court in *Romanski*, which it reviewed in detail. *Lindsey, supra* at 828-831. The Sixth Circuit held, however, that the defendants in *Lindsey* had not acted under color of state law, citing the following factual distinction:

> Plaintiffs argue that *Romanski* supports a finding that Defendant's security personnel were likewise state actors in this case. We disagree. Unlike *Romanski*, where it was undisputed that Defendant's security personnel were licensed under [MCL 338.1079], *here, exactly the opposite appears to be the case.* Plaintiffs' complaint alleges that: "At the time of the seizure[s] and detention[s] . . . , none of [Defendant's] security guards were authorized to make misdemeanor arrests. . . ."
>
> If Defendant's security personnel had in fact been licensed pursuant to [MCL 338.1079], they would have had misdemeanor arrest authority at the time that they seized and detained Plaintiffs. Hence, Plaintiffs' allegation that Defendant's security personnel lacked such authority is by implication an assertion that Defendant's security personnel were not licensed under [MCL 338.1079]. Moreover, at oral argument, Plaintiffs were asked to point the Court to any information in the record that suggested that Defendant's security personnel were licensed pursuant to [MCL 338.1079] at the time of Plaintiffs' arrests, and Plaintiffs could point to no such information. *Plaintiffs have therefore not carried their burden of demonstrating that any of Defendant's security guards were licensed under [MCL 338.1079], and we must proceed under the assumption that all of Defendant's security personnel who interfaced with Plaintiffs were not so licensed.*
>
> The fact that Defendant's security personnel were *not* licensed in this case means that, under the facts of this case, Defendant's conduct in detaining Plaintiffs was not "fairly attributable to the state." . . .

* * *

This analysis [in *Romanski*] demonstrates that the fact that Michigan delegated a part of the police power to licensed private security guards, which it had traditionally and exclusively reserved for itself, was the key fact that justified finding state action in *Romanski*. Although the police power that Michigan bestowed upon licensed security guards pursuant to [MCL 338.1080] was limited in certain respects, the plaintiff in *Romanski* could point to an identifiable police power—the power of arrest—which was not possessed by the citizens of Michigan at large, but instead resided only in the state, its agents, and those persons who the state empowered and regulated by statute. By contrast, Plaintiffs here cannot point to any powers above and beyond those possessed by ordinary citizens that the state of Michigan had delegated to Defendant's unlicensed security personnel at the time of Plaintiffs' arrests. The instant case is thus squarely within the rule of *Chapman*, where this Court held that a merchant exercising the "shopkeeper's privilege" was not a state actor under the public function test. [*Chapman, supra* at 834]. Because Plaintiffs cannot demonstrate that Defendant's security personnel were licensed under [MCL 338.1079], they cannot show that Defendant engaged in action attributable to the state. Plaintiffs therefore cannot demonstrate that Defendant deprived them of their rights secured by the Constitution by acting under color of state law, and their § 1983 claim must fail. [*Lindsey, supra* at 829-831 (emphasis added; some citations omitted).]

E

After reviewing the record in this case, we find that it falls squarely within the facts and legal analysis presented in *Romanski*, which properly concluded as a matter of law that the state-licensed private security officers involved in the casino detention acted under color of state law. Here, the parties do not dispute that at the time of plaintiff's detention on September 14, 2002, Martinez, security manager Chenine McDowell, and Grzadzinski had obtained certification pursuant to

MCL 338.1079. During trial, Martinez, McDowell, and Grzadzinski elaborated on the training they had received, under the tutelage of a Detroit police officer and through the Michigan State Police, to obtain their statutory certifications, which they understood to invest them with the authority to make certain arrests inside the casino. Because the record indisputably establishes that Martinez and others involved in plaintiff's detention on September 14, 2002, primarily Grzadzinski and McDowell, had obtained state licensure pursuant to MCL 338.1079, and, consequently, pursuant to MCL 338.1080, Martinez, Grzadzinski, and McDowell all possessed the power to arrest plaintiff on casino premises for his alleged assault ("a part of the police power" that the state "had traditionally and exclusively reserved for itself," *Lindsey, supra* at 831, citing *Romanski, supra* at 637), and Martinez, Grzadzinski, and McDowell arranged for plaintiff to be held within the casino's security detention room on the basis of this statutory authority, we conclude that the trial court correctly ruled as a matter of law that defendant, through Martinez, Grzadzinski, and McDowell, acted under color of state law for purposes of § 1983.

We stress that ours is decidedly a fact-specific holding, in accordance with the United States Supreme Court's observations in *Lugar, supra* at 939, that the state-action inquiry is "necessarily fact-bound," and that a court's approach to the inquiry must be closely tailored to the evidence before it. We further emphasize that our holding is entirely inconsistent with the notion that licensed, private security guards are always state-actors, or that the mere performance of a task specifically authorized by a state statute confers state actor status. Contrary to the dissent's hyperbolic and dire prophesy, Michigan's day-care providers, plumbers,

barbers, beauticians, electricians, and cab drivers need not fear an onslaught of litigation triggered by our ruling today. Those licensed professionals obviously do not qualify as state actors because they do not exercise powers "traditionally exclusively reserved to the State." *Jackson, supra* at 352. No portion of our opinion conflicts with the oft-repeated principle, first articulated in *Jackson*, that "[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." *Id.* at 350.

In the instant case, the casino's employees arrested and detained a casino customer because they suspected that he had committed an assault and battery. Those employees' ability to arrest plaintiff derived solely from their special state licensure. Officers of the Detroit Police Department expressly approved the casino employees' actions. These facts conclusively demonstrate that the casino's employees exercised powers "traditionally exclusively reserved to the state," and did so with the encouragement and approbation of the state.

Indeed, the record of state action here far exceeds the state action involved in *Romanski*. Here, licensed security guards effectuated an arrest to investigate a violent crime, while Mrs. Romanski's detention arose from a suspected larceny. The power to arrest and detain a larcenous customer does not rest exclusively with the state of Michigan, but resides in all Michigan security guards by virtue of MCL 338.1079(2). Furthermore, the city police officers here watched and helped direct the security personnel's decision to take plaintiff into custody, while the security personnel in *Romanski* acted in the absence of any police presence. We therefore reject as completely unfounded the dissent's suggestion that our decision unreasonably expands state-action concepts.

Although defendant urges that we reject *Romanski* as a nonbinding intermediate federal appellate court decision, this Court plainly may adopt as persuasive a "lower federal court decision[]" involving federal law. *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004). Furthermore, as noted, we view the similar relevant facts and applicable legal analysis in *Romanski* as persuasive in this case, and defendant has not identified, and we have not located, any United States Supreme Court decision casting doubt on the state-actor conclusion in *Romanski*. The Supreme Court declined to consider the holding in *Romanski*, denying certiorari at ___ US ___; 127 S Ct 209; 166 L Ed 2d 257 (2006).

F

We additionally note that the United States Supreme Court has provided a succinct principle to aid in the analysis of the state-action requirement in § 1983 cases, which we view as instructive to our state-action conclusion in this case. "[I]n the usual case we ask whether the State provided a mantle of authority that enhanced the power of the harm-causing individual actor." *Nat'l Collegiate Athletic Ass'n v Tarkanian*, 488 US 179, 192; 109 S Ct 454; 102 L Ed 2d 469 (1988). The instant record establishes indisputably that plaintiff's detention within the locked casino security room commenced immediately after a combined force of Detroit police officers and casino security personnel confronted plaintiff, his attorney, and his other companions as they attempted to leave the casino grounds. Both Grzadzinski and Richard Novak testified that the Detroit police officers authorized, and indeed encouraged, defendant's security personnel to seize plaintiff and escort him back to the casino. This evidence strongly supports our

conclusion that the state "provided a mantle of authority" that constrained plaintiff to subject himself to detention by defendant.

> [T]o act "under color of" state law for § 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting "under color" of law for purposes of § 1983 actions. [*Dennis v Sparks*, 449 US 24, 27-28; 101 S Ct 183; 66 L Ed 2d 185 (1980).]

In *Chapman, supra,* at 835, the Sixth Circuit, sitting en banc, concluded that a customer's detention by a store security guard could qualify as an act "that may fairly be attributed to the state." The security guard, an off-duty, armed, uniformed sheriff's deputy, initiated a strip search of the customer, and store policy mandated "police intervention in strip search situations . . . ." *Id.* at 835. Utilizing the "symbiotic or nexus test," the Sixth Circuit held that a genuine issue of material fact existed "as to whether the security officer acted under 'color of state law' " when he initiated the search. *Id.* at 834-835. The Sixth Circuit explained that a § 1983 claimant could satisfy the symbiotic or nexus test by demonstrating "that there is a sufficiently close nexus between the government and the private party's conduct so that the conduct may be fairly attributed to the state itself." *Chapman, supra.* at 834.[7]

---

[7] See also *Murray v Wal-Mart, Inc,* 874 F2d 555, 558-559 (CA 8, 1989) (noting the general proposition that a § 1983 plaintiff may obtain relief by demonstrating that a private party acted as "a willful participant in joint activity with the State or its agents which activity deprived the plaintiff of a constitutional right," and the more specific principle that "state action is present when private security guards and police officers act in concert to deprive a plaintiff of his civil rights") (internal quotation marks and citation omitted).

The testimony in the instant case established not only a close working relationship between defendant's security personnel and the Detroit police officers posted near the casino, but a joint and cooperative effort to detain plaintiff either in a city jail cell or its casino equivalent. We therefore hold, in conformity with the *Chapman* majority, that defendants' joint engagement with the Detroit police in the arrest and detention of plaintiff also satisfies the symbiotic relationship or nexus test of action "under color of state law."[8]

G

We do not find persuasive defendant's suggestion that the "private detention" of plaintiff could not constitute state action. According to this argument, defendant's employees' "conduct in detaining, processing and eventually 86'ing Plaintiff, constituted, at most, an 'arrest' for purposes of state civil liability," and the jury's rejection of plaintiff's false-arrest claim eliminated defendant's "state action" liability. In our view, this distinction lacks a meaningful difference, particularly under the circumstances presented here. Defendant's security personnel restrained plaintiff's freedom

---

[8] We cannot ignore the dissent's characterization of our holding as "absurd," *post* at 237, and choose to observe simply that we have walked precisely the same decisional path as the Sixth Circuit judges who decided *Romanski* and *Chapman* (an en banc panel), the Seventh Circuit judges who decided *Payton*, *supra*, and the Eighth Circuit judges who decided *Murray, supra.*

In response to defendant's protestation on appeal that in the trial court plaintiff never proposed the symbiotic relationship or nexus test as a potential basis for finding state action, we observe that we have the authority to consider this question of law for the first time on appeal because all facts necessary for its resolution appear in the existing record. *Royce v Chatwell Club Apartments*, 276 Mich App 389, 399; 740 NW2d 547 (2007), application for leave to appeal held in abeyance 743 NW2d 213 (2008).

of movement because they believed he assaulted and battered Martinez. Defendant's employees' entitlement to detain plaintiff—either momentarily or for two hours and 15 minutes—derived directly from their state licensure. Their conduct, therefore, qualified as state action, and deprived plaintiff of a right "secured by the Constitution." See *Davis v Mississippi*, 394 US 721, 726-727; 89 S Ct 1394; 22 L Ed 2d 676 (1969), in which the United States Supreme Court observed that "the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions,'" and *Dunaway v New York*, 442 US 200, 216; 99 S Ct 2248; 60 L Ed 2d 824 (1979) (observing that "detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest").

The trial testimony here shows that when plaintiff and his companions were surrounded by casino security personnel and Detroit police officers, Grzadzinski offered plaintiff two choices, go with the police or return to the casino security office to discuss the matter; at no time was plaintiff advised he could simply continue his departure from casino property. Although plaintiff's testimony suggested that he returned to the casino voluntarily,[9] other trial testimony shows that after Grzadzinski escorted plaintiff to the casino detention room, plaintiff remained there against his will for more than two hours. Under these circumstances, the jury reasonably could have found a violation of § 1983.

---

[9] Even if plaintiff initially consented to a form of administrative reprimand or casino exclusion process, the evidence of record clearly demonstrates that his detention ceased to be consensual when he requested that the door not be locked and that his attorney be summoned.

The dissent also asserts that "[t]he security guards never exercised any power to arrest," *post* at 235, and points to the jury's verdict that "no false arrest occurred in this case." *Post* at 235 n 2. Although defendants did not *falsely* arrest plaintiff, the evidence demonstrates that he was detained, placed into custody, and thereafter subjected to the will of defendant's security personnel. In *People v Gonzales*, 356 Mich 247, 253; 97 NW2d 16 (1959), our Supreme Court adopted the following definition of "arrest":

> An arrest is the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest. The act relied upon as constituting an arrest must have been performed with the intent to effect an arrest and must have been so understood by the party arrested. [Internal quotation marks and citation omitted.]

The jury's rejection of plaintiff's false-arrest claim does not alter the fact that defendant's security officers restricted plaintiff's freedom of movement during the two hours and 15 minutes of his detention,[10] and did so on the basis of the authority provided by MCL 338.1080 to the security officers. The dissent has identified no basis other than MCL 338.1080 that would have permitted plaintiff's arrest and detention, and we are unaware of any. The licensing statute provided the mantle of authority for defendant's security personnel,

---

[10] Michigan's regulations governing casinos permit them to physically detain persons "suspected of criminal activity" and to secure such persons "in [a] temporary holding area for purposes of detention or arrest . . . ." Mich Admin Code, R 432.11003(1), (3). The regulations further provide, "As a general rule, a person shall not be detained in a temporary holding area awaiting transport for more than 2 hours." Mich Admin Code, R 432.11003(4).

and imbued them with virtually the same powers as the Detroit police officers who explicitly approved defendants' decision to escort plaintiff back to the casino.

H

We also find unpersuasive defendant's related suggestion that no state action existed here because, although several of its officers had certification under MCL 338.1079 and the authority to arrest pursuant to MCL 338.1080, they routinely did not employ their authority to arrest casino patrons. We agree with the following portion of *Romanski*, in which the Sixth Circuit rejected this precise contention:

> Finally, we address Defendants' repeated representation that, although empowered to make arrests under [MCL 338.1080], Brown and the other casino employees licensed under the statute are, as a matter of casino policy, not permitted to exercise this statutory authority to effectuate arrests. For this argument Defendants again rely on *Wade*, in which the very document that was the source of the defendant's police-type powers, his contract with the public housing authority, at the same time imposed profound limits on those powers. *See Wade* [*supra* at 905-906]. Here the source of Brown's power to make arrests is a statute that includes no qualitative limits on that power, so *Wade* is inapplicable. Defendants do not cite a case in which a private security officer licensed to make arrests as under [MCL 338.1080] was held not to be a state actor on the ground that the officer's employer substantially circumscribed the arrest power conferred on the officer by having been licensed. [*Romanski, supra* at 639-640.]

I

We additionally reject that *Grand Rapids v Impens*, 414 Mich 667; 327 NW2d 278 (1982), on which defendant and the dissent rely heavily, controls the state-

actor analysis in this case. In *Impens*, the Michigan
Supreme Court considered "whether a signed state-
ment procured by private security guards, one of whom
was an off-duty deputy sheriff, may be admitted into
evidence against a defendant even though no *Miranda*
warnings were given." *Id*. at 670 (citation omitted). The
Supreme Court surveyed several decisions holding
"that private security guards who receive direct assis-
tance from public police officers or who work in close
connection with the police may be acting under color of
state law, subject to constitutional restrictions." *Id*. at
674. The Supreme Court concluded, in relevant part, as
follows:

> We do not believe that the activities of the store security
> guards and the city police in this case demonstrated the
> coordinated effort necessary to constitute state action. The
> Meijer security personnel were working with the view of
> furthering their employer's interest only; they were not
> acting as police agents. Their role may be viewed as an
> extension of the common-law shopkeepers' privilege to
> detain for a reasonable period of time a person suspected of
> theft or failure to pay. There was no complicity with the
> police department or any indication that their acts were
> instigated or motivated by the police.

> \* \* \*

> Defendant also contends that Meijer security personnel
> qualified as law enforcement officers because state action
> has granted them greater authority than that possessed by
> private citizens. . . . [D]efendant believes that the licensing
> statutes which regulate private security guards demon-
> strate the requisite degree of state action to bring their
> activities under color of state law, subject to constitutional
> restraints. See MCL 338.1051 *et seq*. . . . . We disagree. We
> do not believe that the mere licensing of security guards
> constitutes sufficient government involvement to require
> the giving of *Miranda* warnings. . . .

\* \* \*

> Our statute specifically states that "private security
> police employed for the purpose for guarding the property
> and employees of their employer and generally maintaining
> plant security for their employer" need not be licensed.
> MCL 338.1079. . . . This language speaks to the exact
> function performed by Meijer's security personnel. We do
> not believe that qualification for such licensing exclusion
> equates the actions of private security guards with those of
> law enforcement officers. [*Impens, supra* at 675-677 (cita-
> tion omitted).]

The Supreme Court did not elaborate regarding
whether the defendant security officers had obtained
state licensing, thus investing them with the authority
to make arrests pursuant to MCL 338.1080. The Su-
preme Court made no reference whatsoever to MCL
338.1080.

As reflected in the following portion of *Romanski*,
which we also find persuasive, the Sixth Circuit likewise
considered the effect of the Michigan Supreme Court's
decision in *Impens* on the question of state action in the
context of a § 1983 action:

> The dissent's repeated reliance on *City of Grand Rapids
> v. Impens* . . . is misplaced. There, private security officers
> suspected the defendant and two others of shoplifting. *Id.*
> at 279. The officers *asked* the three individuals to come to
> the security office. *Id.* The officers searched the three and
> found merchandise on one of the other individuals. *Id.* The
> officers then elicited information from the defendant to
> complete a "Loss Prevention Department Voluntary State-
> ment." *Id.* The officers read the statement to the defendant
> and asked the defendant to sign it, which he did. *Id.* "There
> was no indication that defendant would not be released if
> the statement were not signed." *Id.* Prior to his trial, the
> defendant moved to suppress the signed statement, argu-
> ing that it was obtained in violation of *Miranda. Id.* The

Michigan Court held that the private security officers were not required to give *Miranda* warnings. *Id.* at 282.

> *One obvious distinction between the instant case and Impens is that Impens did not involve an arrest in any form.* There, the defendant was not held against his will. He was asked to go to the security office; he was asked to sign a form. There was no indication of arrest.

> *The key distinction, however, is that the security officers did not exercise power exclusively reserved to the states.* The contested conduct was the security officers' elicitation of the defendant's statements. Simply put, asking questions in a non-custodial setting is a power not within the exclusive province of the state. [*Romanski, supra* at 638 n 2 (some emphasis added).]

The dissent asserts that *Impens* should control the outcome of this case because it held that "the simple fact of licensure would not transform a private security guard into a state actor." *Post* at 235. As we have emphasized, however, "the simple fact of licensure" did not "transform" defendant's security guards into state actors. Rather, their licensure triggered the security guards' exercise of a power traditionally and exclusively reserved to the state. And unlike the security guards in *Impens*, defendant's security personnel here employed a "coordinated effort" with police officers, thus unquestionably acting as "police agents." These distinctions are not "immaterial," as the dissent claims, *post* at 234, but central to the *Impens* decision, at least according to the justices who wrote and joined that opinion.

We conclude that, irrespective of whether the trial court may have employed incorrect logic, the court correctly distinguished *Impens* from the instant case. *Coates v Bastian Bros, Inc*, 276 Mich App 498, 508-509; 741 NW2d 539 (2007) (observing that this Court "will not reverse if the right result is reached, albeit for the wrong reason").

J

Defendant alternatively maintains that the trial court should have ordered a new trial, in light of the defective jury instructions concerning plaintiff's § 1983 claim. This Court reviews for an abuse of discretion a trial court's ultimate decision whether to grant a new trial, but considers "de novo any questions of law that arise." *Kelly v Builders Square, Inc*, 465 Mich 29, 34; 632 NW2d 912 (2001).

> This Court reviews claims of instructional error de novo. MCR 2.516(D)(2) states that the trial court must give a jury instruction if a party requests such instruction and it is applicable to the case. We review for abuse of discretion the trial court's determination whether a standard jury instruction is applicable and accurate. The trial court's jury instructions must include all the elements of the plaintiffs' claims and should not omit any material issues, defenses, or theories of the parties that the evidence supports. . . . If, on balance, the theories of the parties and the applicable law are adequately and fairly presented to the jury, no error requiring reversal occurs. Reversal based on instructional error is only required where the failure to reverse would be inconsistent with substantial justice. MCR 2.613(A) . . . . [*Lewis v LeGrow*, 258 Mich App 175, 211-212; 670 NW2d 675 (2003) (citations omitted).]

1

Defendant first complains that the trial court erred by failing to explain to the jury that the casino could only face vicarious liability for any constitutional violation by its employees "pursuant to a custom, policy or practice of th[e] employer." (Defendant's brief, p 33.) Before instructing the jury, the trial court agreed, over plaintiff's objection, to instruct the jury regarding the concept of respondeat superior. But when instructing the jury, the trial court failed to incorporate any refer-

ence to vicarious liability. After the jury retired to deliberate, defense counsel apprised the trial court that it had "omitted instructing on private security officer, MCL 338[.1079]." Plaintiff's counsel replied that he had no objection to the private-security-officer instruction, and the following exchange then occurred:

> *The Court*: Alright, I'll give it. Anything else?
>
> *Defense Counsel*: No, we've been through it all.

The jury returned and received instruction with respect to the authority of private security officers, after which the parties again discussed the propriety of the instructions:

> *The Court*: Gentlemen, are the, is the Plaintiff satisfied with the instructions and form of the verdict?
>
> *Plaintiff's Counsel*: Your Honor, other than the previously positions [sic], yes your Honor.
>
> *The Court*: And the Defendant.
>
> *Defense Counsel*: Ditto.

The above-quoted exchanges reflect defendant's forfeiture ("No, we've been through it all") and waiver of a vicarious-liability-instruction objection, because defense counsel ultimately and affirmatively expressed satisfaction with the instructions to the jury. Defendant's expression of satisfaction with the instructions, which omitted the vicarious-liability instruction, constitutes a waiver that extinguishes any error concerning vicarious liability. *Grant v AAA Michigan/ Wisconsin, Inc (On Remand)*, 272 Mich App 142, 148; 724 NW2d 498 (2006).[11]

---

[11] Even assuming that defendant only forfeited its objection to the trial court's omission of a vicarious-liability instruction, this error did not substantially prejudice the defense. MCR 2.613(A). During closing arguments, opposing counsel repeatedly acknowledged the trial testimony

2

Defendant next maintains that the trial court insuffi-
ciently defined for the jury the parameters of a Fourth
Amendment violation, but we once again conclude that
defendant waived any claim of error. After the jury began
deliberating, it requested clarification regarding the
Fourth Amendment, prompting the following exchange:

> *The Court*: And then they say re-read Fourth Amend-
> ment, Fourteenth Amendment parameters. Well techni-
> cally it's not in evidence. What I propose to do is just tell
> them what the Fourth Amendment is, that citizens of the
> United States shall be protected against unlawful searches
> and seizures. And the Fourteenth Amendment applies that
> to Michigan. Any objections?
>
> *Plaintiff's Counsel*: No your Honor.
>
> *Defense Counsel*: I do your Honor. I think you've read
> the illegal search and seizure instruction. And I think to
> instruct them in something different at this point may even
> cause greater confusion.
>
> *The Court*: Well shall I simply—
>
> *Plaintiff's Counsel*: Reread that instruction.
>
> *The Court*: Reread that instruction[?][12]

and documentary evidence substantiating the casino's adherence to
various detention-related policy provisions relevant to this case. The trial
court's neglect to additionally instruct the jury that the casino could only
face liability for actions that its agents took pursuant to casino rules or
policies thus had no adverse effect on the jury's determination of the
casino's liability under § 1983.

[12] Contrary to defendant's suggestion that the trial court did not supply
the jury with "an articulable standard by which to" consider a Fourth
Amendment violation, the trial court did instruct the jury in detail
regarding the § 1983 claim, in relevant part, as follows:

> Ladies and gentlemen, I'm now going to begin a series of
> instructions on . . . . unlawful search. Under the Constitution of
> the United States, that is the Fourth Amendment, every person
> has the right not to be subjected to unreasonable searches and

*Defense Counsel*: Yes, I think that's the way it should be done.

The trial court proceeded to reiterate to the jury the two constitutional elements of § 1983, but did not include the detailed paragraph regarding probable cause that initially had followed the § 1983 elements. Nonetheless, when the trial court inquired whether "[d]efendant [was] satisfied," his counsel affirmatively replied, "Yes your Honor." To the extent that the trial court's reinstruction—at defense counsel's request—qualified as erroneous, defense counsel's affirmative expression of satisfaction with the trial court's charge extinguished any error. *Grant, supra* at 148.

---

seizures. In order to prove this claim, Plaintiff must prove by a preponderance of evidence each of the following elements. First, the Defendant intentionally violated Plaintiff's constitutional right by conducting an unreasonable search and seizure. Second, that the Defendant's acts were the proximate cause of damages sustained by the Plaintiff.

Additional instructions. . . .

It is also a statement of our law that any person who assaults or assaults and batters an individual shall be guilty of a misdemeanor. This is the definition of probable cause. If an arrest is lawful when made, there has not been a false arrest or false imprisonment. Instead, claims of false arrest and false imprisonment require Plaintiff prove that the arrest or detention lacked probable cause. Probable cause that a particular person has committed a crime is established by a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant the cautious person in the belief that the accused is guilty of the offense. If you find the Defendants had probable cause to believe that Plaintiff committed an assault on the Motor City Casino security officer, then you decide, you must decide that Motor City Casino personnel were entitled to detain Plaintiff.

After reviewing these instructions in their entirety, we conclude that they adequately describe the legal principles governing a determination whether defendants unlawfully searched or seized plaintiff, in violation of the Fourth Amendment. *Lewis, supra* at 211-212.

### III. CHALLENGES TO PUNITIVE-DAMAGES AWARD

Defendant next contends that the trial court should have granted a new trial on the issue of § 1983 punitive damages because the jury's award was inconsistent with its rejection of plaintiff's counts alleging false arrest, assault and battery, and intentional infliction of emotional distress, and with plaintiff's request for exemplary damages.

Our review of the record leads us to conclude, however, that the entirety of the jury's special verdict comports with the trial evidence and the trial court's careful and extended delineation of the distinctions between, and components of, compensatory damages, exemplary damages, and punitive damages. As this Court has observed, "The Michigan Supreme Court has repeatedly held that the jury's verdict must be upheld, even [if] it is arguably inconsistent, if there is an interpretation of the evidence that provides a logical explanation for the findings of the jury." *Allard v State Farm Ins Co*, 271 Mich App 394, 407; 722 NW2d 268 (2006) (internal quotation marks omitted). Furthermore, a reviewing court must make "every attempt . . . to harmonize a jury's verdicts. Only where verdicts are so logically and legally inconsistent that they cannot be reconciled will they be set aside." *Id.* (internal quotation marks omitted).

The jury's finding that defendants unlawfully detained plaintiff (special verdict question 1), its somewhat similar finding that defendants falsely imprisoned plaintiff (special verdict question 3), coupled with its rejections of plaintiff's other proffered tort claims, namely false arrest, assault and battery, and intentional infliction of emotional distress (special verdict questions 2, 4, and 5), suggest that the jury viewed defendants' initial arrest or seizure of plaintiff and the

placement of plaintiff in the casino's security office as premised on probable cause that plaintiff may have unlawfully touched Martinez, but concluded that defendants eventually detained plaintiff against his will, or extended the seizure's duration for too long. The jury's special verdicts 1 through 5 find support in the evidence and appear to be at a minimum reasonably consistent.

Regarding defendant's specific challenge to the jury's awards of damages, in special verdict question 6 the jury found that defendant had caused plaintiff $125,000 in "non-economic loss compensatory damages," which the trial court explained should "fairly and adequately compensate[] him" "for mental anguish, fright and shock and embarrassment." The jury then rejected the claim that plaintiff would sustain future compensatory damages. (Special verdict question 7.) In special verdict question 8, the jury considered and rejected the claim that plaintiff had endured exemplary damages, which the trial court defined as "injury to Plaintiff's feelings," in this case "humiliation, outrage or indignity." Lastly, the jury found that defendants had violated "plaintiff's right to be free from unreasonable searches and seizures under the Fourth and Fourteenth [a]mendments to the U.S. Constitution" (special verdict question 9), and awarded plaintiff $400,000 in punitive damages (special verdict question 10), which the trial court described as an amount "appropriate to punish the Defendants or to deter the Defendants and others from like conduct in the future."[13]

In summary, we fail to detect any manner by which the jury rendered an inconsistent verdict regarding

---

[13] The trial court carefully and at length distinguished for the jury the three types of damages at issue in this case.

defendant's liability or plaintiff's entitlement to the three distinct types of damages he sought. *Allard, supra* at 407.

IV. CHALLENGES TO FALSE-IMPRISONMENT SPECIAL VERDICT

Defendant additionally asserts that the trial court erred by denying its motion for a directed verdict with respect to plaintiff's false-imprisonment count because Grzadzinski indisputably had probable cause to detain plaintiff. The trial testimony plainly reflects that plaintiff and the several members of his group offered recollections of the September 14, 2002, confrontation that differed markedly from the testimony of Martinez, Grzadzinski, McDowell, and Jeanne Snyder, plaintiff's former fiancée, regarding the important issues whether (1) plaintiff made nonchalant arm gestures, (2) plaintiff might have been close to or distant from Martinez at the time plaintiff gestured, and (3) plaintiff intentionally poked, punched, struck, or otherwise touched Martinez's chest. Given the widely contradictory testimony offered in these areas, which were central to a determination whether defendant possessed probable cause through its security personnel to arrest or detain plaintiff, it was the jury's prerogative to resolve this issue of fact, including the inherent credibility questions. *Zeeland Farm, supra* at 195; *Hunt, supra* at 99. Consequently, the trial court properly denied a directed verdict on plaintiff's false-imprisonment count.

Alternatively, defendant suggests that the trial court should have granted a new trial because it inadequately explained to the jury the elements of false imprisonment, and that the instructions given did not support the jury's rejection of the false-arrest claim while finding liability for false imprisonment. The trial court read to the jury four paragraphs of instructions differentiat-

ing the elements of false arrest from false imprison-
ment. As defendant acknowledges, these instructions
very closely tracked Michigan Model Civil Jury Instruc-
tions 116.01 ("False Arrest—Definition"), 116.02
("False Imprisonment—Definition"), 116.20 ("False
Arrest—Burden of Proof"), and 116.21 ("False
Imprisonment—Burden of Proof"). Defendant also con-
cedes that within the next two to four paragraphs, the
trial court fleshed out, in the context of plaintiff's
§ 1983 claim, the concept of probable cause necessary to
render a search or seizure reasonable and lawful.

We conclude that, taken as a whole, the trial court's
extended and indisputably accurate recitation of the
relevant legal principles regarding false arrest, false
imprisonment, and probable cause fully and fairly set
forth for the jury the elements of false arrest and false
imprisonment. *Lewis, supra* at 211-212. And as dis-
cussed in part III of this opinion, applying the false-
arrest and false-imprisonment instructions to the facts
of this case demonstrates that the jury likely, and
reasonably, viewed the casino's initial detention of
plaintiff in its security area as supported by probable
cause that he assaulted Martinez, but deemed plain-
tiff's more than two-hour detention locked in the casi-
no's security office as unsupported by any legal basis,
and therefore amounting to false imprisonment.

### V. REMITTITUR REQUEST CONCERNING
### NONECONOMIC-DAMAGES AWARD

Defendant lastly complains that the trial court
should have remitted the jury's award of $125,000 in
compensatory damages, which lacked support in the
trial evidence, especially given that the jury rejected
that defendants had intentionally inflicted emotional
distress.

In determining whether remittitur is appropriate, a trial court must decide whether the jury award was supported by the evidence. This determination must be based on objective criteria relating to the actual conduct of the trial or the evidence presented. The power of remittitur should be exercised with restraint. If the award for economic damages falls reasonably within the range of the evidence and within the limits of what reasonable minds would deem just compensation, the jury award should not be disturbed. A trial court's decision regarding remittitur is reviewed for an abuse of discretion. We review all of the evidence in the light most favorable to the nonmoving party. [*Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 462; 750 NW2d 615 (2008) (citations omitted).]

Plaintiff testified that he endured extreme embarrassment on multiple occasions because of defendants' detention of him for more than two hours on September 14, 2002, their decision to eject and ban him from the casino, and Martinez's pursuit of criminal assault and battery charges against him. Specifically, plaintiff averred that on a daily basis he experienced extreme feelings of upset and embarrassment because of (1) the casino's treatment of him on September 14, 2002; (2) his May 2003 Metro Airport arrest on an outstanding assault and battery warrant while attempting to pick up his girlfriend; (3) his September 2003 appearance in the 36th District Court for a scheduled criminal trial; (4) his 2005 discovery of the existence of more arrest warrants stemming from September 14, 2002; (5) the 2005 jury trial for assault and battery that ultimately ended in his acquittal, and (6) his testimony in the instant civil case. Although plaintiff did not substantiate that he experienced any significant change in the course of his daily activities, his testimony that defendants' conduct caused him extreme upset and embarrassment on multiple occasions, especially when viewed

in the light most favorable to plaintiff, amply supports the jury's award of $125,000 in noneconomic compensatory damages.[14]

Affirmed.

BORRELLO, J., concurred.

O'CONNELL, P.J. (*dissenting*). I respectfully dissent. In my opinion, the trial court erred when it failed to grant defendant's motion for directed verdict regarding plaintiff's 42 USC 1983 claim because private security guards are not state actors. The trial court also erred by adopting federal precedent as persuasive and rejecting the Michigan Supreme Court's reasoning in *Grand Rapids v Impens*, 414 Mich 667, 670; 327 NW2d 278 (1982). I would reverse the decision of the trial court.

In order to maintain an action under § 1983, a plaintiff is required to establish that he or she was "deprived of a right secured by the Constitution or laws of the United States" and that the defendant was a "state actor," i.e., acting under color of state law at the relevant time. *American Mfrs Mut Ins Co v Sullivan*, 526 US 40, 49; 119 S Ct 977; 143 L Ed 2d 130 (1999). "[M]erely private conduct, no matter how discriminatory or wrongful" will not support a § 1983 claim. *Id.* at 50 (internal quotation marks and citations omitted). The plaintiff bears the burden to show state action because it is an element of the claim. *Brentwood Academy v Tennessee Secondary School Athletic Ass'n*, 531 US 288, 308-309; 121 S Ct 924; 148 L Ed 2d 807 (2001).

---

[14] Because we are affirming the jury's special verdict, we need not consider the questions raised in plaintiff's "contingent" brief on cross-appeal, which repeatedly sets forth that he wishes this Court to consider the cross appeal only "in the unlikely event that the jury's verdict is disturbed and this matter is remanded for further proceedings." (Brief on cross-appeal, pp 1, 16.)

Accordingly, in order for plaintiff to maintain his § 1983 claim, he was required to establish that the casino's private security officers were state actors.

The trial court held as a matter of law that the casino's private security guards were acting under color of state law by virtue of the fact that they were certified under MCL 338.1079, relying on *Romanski v Detroit Entertainment, LLC*, 428 F3d 629, 636 (CA 6, 2005). "Although state courts are bound by the decisions of the United States Supreme Court construing federal law, there is no similar obligation with respect to decisions of the lower federal courts." *Abela v Gen Motors Corp*, 469 Mich 603, 606; 677 NW2d 325 (2004) (citations omitted). On the other hand, Michigan Supreme Court cases on point are binding on lower courts, regardless of whether the lower courts agree with the decision. *Detroit v Vavro*, 177 Mich App 682, 685; 442 NW2d 730 (1989). In my opinion, it is clear that the trial court erred by not following the Michigan Supreme Court decision in *Impens*, because the logic behind the decision is controlling and dispositive of the issue.

In *Impens*, our Supreme Court impliedly determined that private security guards are not state actors simply because they are certified under MCL 338.1079. Indeed, at least one federal district court recognized this fact:

> Plaintiff here has not identified any state or local legislation that confers broad police powers upon security personnel. In fact, Michigan's security guard licensing statute limits the powers of security guards. Pursuant to the statute, upon obtaining a license, a private security officer is granted "the authority to arrest a person without a warrant" to the same extent possessed by public police officers, but only when this officer "is on the employer's premises." Mich. Comp. Laws § 338.1080. This authority is further limited to the security guard's "hours of employment as a private security police officer and does not

extend beyond the boundaries of the property of the employer." Mich. Comp. Laws § 338.1080.

The limited powers conferred under this statute do not convert private security guards into state actors. This has been confirmed by the definitive arbiter of the proper meaning of this statute, the Michigan Supreme Court..... 

[In *Impens*, t]he Michigan Supreme Court held that the defendant had not identified any state action that would trigger the requirement of *Miranda* warnings. In so ruling, the Court specifically rejected the defendant's contention that "the licensing statutes which regulate private security guards demonstrate the requisite degree of state action to bring their activities under color of state law, subject to constitutional restraints." 327 N.W.2d at 281. Instead, the Court concluded that "we do not believe that the mere licensing of security guards constitutes sufficient government involvement to require the giving of *Miranda* warnings." 327 N.W.2d at 281. This Court, of course, is bound by the views of Michigan's highest court as to the extent of authority conferred under the Michigan security guard licensing statute. [*Smith v Detroit Entertainment, LLC*, 338 F Supp 2d 775, 780-781 (ED Mich, 2004) (emphasis added).]

In my opinion, this is the better analysis, because it recognizes the implications of the logic behind *Impens* and gives the ruling of our state's highest court the deference the law requires. It is this case, and not *Romanski*, on which the trial court should have relied.

The majority attempts to avoid the application of *Impens* with immaterial distinctions. Specifically, the majority notes that our Supreme Court did not determine whether the security officers in the *Impens* case had been licensed and that the opinion made no reference to MCL 338.1080. A review of the opinion indicates that it was unnecessary for the *Impens* Court to determine whether the security officers were licensed. The Court "[did] not believe that the mere licensing of

security guards constitutes sufficient government involvement to require the giving of *Miranda* warnings." *Impens, supra* at 676. Accordingly, it was unnecessary for the Court to determine, or even mention, whether the security guards were licensed because the simple fact of licensure would not transform a private security guard into a state actor.[1]

Similarly, the Court's failure to reference MCL 338.1080 does not render *Impens* inapposite. MCL 338.1080 provides for a limited power of arrest to those security guards licensed under MCL 338.1079. Because the power to arrest under MCL 338.1080 is conferred solely by licensure under MCL 338.1079, if licensure alone does not constitute state action, then acknowledgment that licensure confers an arrest power is similarly insufficient. Importantly, in the instant case, plaintiff was not arrested, but voluntarily went with the security officers back to the casino's security office. The security guards never exercised any power to arrest.[2] Accordingly, it must be simply the existence of this limited power of arrest pursuant to MCL 338.1080 that gave the security officers in the present case a police power traditionally and exclusively reserved to the state. Such

[1] If state licensing were, in fact, all that was necessary to transform private individuals into state actors, state licensure of plumbers, beauticians, electricians, and even attorneys would transform their conduct into state action subject to a § 1983 claim. Our courts would be inundated with civil-rights litigation concerning bad haircuts, leaky plumbing, and faulty wiring.

[2] Both the jury verdict and the plaintiff's testimony confirm that no false arrest occurred in this case. Plaintiff testified that he voluntarily went with the casino's private security guards, and the jury found no cause of action on plaintiff's false-arrest claim. The private security guards also testified that plaintiff was not under arrest. These facts are conclusive that no false arrest occurred, and, absent a false arrest, plaintiff's allegation that defendants abused their statutory arrest powers is clearly meritless.

a conclusion broadly confers "state actor" status to all security guards who are licensed under MCL 338.1080 and is at odds with *Impens*.

One of the men who aided in the apprehension in *Impens* was an off-duty deputy sheriff. The Court held that his presence did not constitute "color of law," in part because he was off-duty and identified himself as a store employee. *Impens, supra* at 677. If the mere existence of arrest authority under MCL 338.1080 were sufficient to confer "state actor" status, there would be no logical basis for our Supreme Court's holding that the off-duty deputy sheriff in *Impens* was not acting under color of law, because even off-duty, he still had the power to arrest. The holding of the United States Court of Appeals for the Sixth Circuit, sitting en banc, in *Chapman v Higbee Co*, 319 F3d 825 (CA 6, 2003), is similarly irreconcilable with the majority's broad conclusion. The security guard in *Chapman* was "an off-duty sheriff's deputy, wearing his official sheriff's department uniform, badge, and sidearm." *Id.* at 834. As a police officer, the security guard possessed plenary police power. Yet the *Chapman* court did not conclude that mere possession of that authority resulted in state action. Instead, it examined the specific actions taken by the security officer, which included a strip search, and noted that store policy mandated police involvement for such an action. *Id.* at 834-835. If the security guards in *Impens* and *Chapman* were not state actors, despite having been licensed by the state as police officers with full arrest powers, it is clear that licensure under MCL 338.1079 alone cannot transform the casino's private security guards into state actors in the present case.

The majority argues that because the security guards were licensed under MCL 338.1079, they had the power

to arrest plaintiff pursuant to MCL 338.1080, and that because plaintiff was held in a room on the basis of this authority, the security guards acted under color of state law. Application of such reasoning to other Michigan statutes would result in absurd and unintended outcomes that would destroy the "state actor" requirement of § 1983 altogether. Under MCL 764.16, private persons are given the authority to make arrests under certain situations. Every security guard who is unlicensed and, therefore, without authority under MCL 338.1080, still has the limited power given to all private persons under MCL 764.16. Having received authority from the state to arrest, any security guard who locked someone in an office pursuant to that authority becomes a state actor, notwithstanding all the prior caselaw that finds such actions to be that of private individuals. See, e.g., *Lindsey v Detroit Entertainment, LLC*, 484 F3d 824, 827-828 (CA 6, 2007). The fact that a private person has the power to arrest does not transform the person into a state actor. Rather, it would be the exercise of that power that would create state action. That is why the presence of state action is "fact-specific, and . . . determined on a case-by-case basis." *Chapman, supra* at 834.

It takes very little imagination to envision the havoc that would result from the application of the majority's holding. Whether it is the licensed day-care provider who places a four-year-old child in "time-out" for hitting another child, or the licensed cab driver who refuses to let a passenger leave the cab until the fare is paid, the majority would conclude that because MCL 764.16 gives these private persons the power to arrest, they are state actors. Thousands of everyday private actions would be distorted into state action for which plaintiffs will seek monetary remedies from taxpayer funds and overwhelm our already burdened courts.

Because I find *Impens* controlling, *Romanski* is inapplicable, and the trial court erred in relying on it to deny defendant's motion for directed verdict. The simple fact of licensure under MCL 338.1079 cannot, does not, and should not transform private security guards into state actors. To hold otherwise expands state action to a point that strains credulity.

I would reverse the decision of the trial court.