# STATE OF MICHIGAN

# COURT OF APPEALS

CHARTER TOWNSHIP OF SHELBY,

       Plaintiff-Appellee,

v

ARGONAUT INSURANCE COMPANY,

       Defendant-Appellant.

UNPUBLISHED
December 22, 2015

No. 324447
Macomb Circuit Court
LC No. 2013-005046-CZ

Before: SAWYER, P.J., and BECKERING and BOONSTRA, JJ.

PER CURIAM.

Defendant Argonaut Insurance Company appeals as of right the trial court's opinion and order granting plaintiff Shelby Township's motion for summary disposition under MCR 2.116(C)(10) and denying defendant's cross-motion for summary disposition in this declaratory judgment action regarding an insurance company's duty to defend and indemnify. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

Defendant issued plaintiff an insurance policy that provided, among other types of coverage, "Law Enforcement Liability Coverage." This case arises out of defendant's refusal to defend, and subsequently indemnify, plaintiff pursuant to that policy with respect to an underlying action in federal court. The actions giving rise to the coverage dispute began with the arrest of Antoinette Pellegrino on an outstanding felony warrant after a traffic stop by Shelby Township police officers.[1] Antoinette's boyfriend and/or ex-husband, James Baum, learned of the arrest and immediately drove to the scene and spoke with police officers. Baum later drove to the police station, seeking further clarification about Antoinette's arrest. Unsatisfied with the responses he had received to this point, Baum, along with Antoinette's son, Anthony Pellegrino, proceeded to the home of Detective Jeffrey Walsh and Officer Beth Walsh, two Shelby Township police officers who lived in Baum's neighborhood and with whom Baum was acquainted. Anthony stayed in Baum's red pickup truck while Baum approached the home and

---

[1] The Shelby Township police officers involved in the traffic stop and arrest are not involved in the present case.

spoke with Beth, who was home with her three children. Jeffrey was on duty at the time and was not at home.

The lower court record contains varying descriptions of the sequence of events that followed. According to plaintiff's complaint in the present case, Baum was agitated from the moment he arrived at the scene of Antoinette's arrest, had to be escorted from the Shelby Township Police Department, and was upset when he arrived at the Walsh home. Plaintiff alleged that Baum stood on the front porch, threatened Beth, and initially refused to leave. When Baum eventually left, Beth placed a telephone call to Jeffrey, relayed the encounter, and stated that she was in imminent fear.

Jeffrey's supervisor, Sergeant Jason Schmittler, authorized Jeffrey to respond to Beth's call for assistance. Schmittler's supervisor, Lieutenant Gerald VanHoet, instructed both Schmittler and Det. Jacquemain, who were on duty at the time, to respond to the Walsh home as well. Because the Walsh home was located in Macomb County, Jeffrey also requested Shelby Township dispatch to notify the Macomb County Sheriff's Department about the situation and ask for Macomb officers to be dispatched as well.

While en route to the Walsh home, Jeffrey received a telephone call from Beth reporting that Baum had threatened to return and that he was "break torque-ing" down the street in a red pickup truck. Jeffrey communicated this information over the police radio to Sgt. Schmittler and Det. Jacquemain, who responded by changing course and heading toward Baum's nearby residence in an effort to detain Baum and Anthony. Jeffrey, who was driving separately and who was a few minutes behind Schmittler and Jacquemain, also proceeded to Baum's house.

Upon arrival at Baum's house, Sgt. Schmittler and Det. Jacquemain observed Baum and Anthony getting into Baum's truck. According to plaintiff, both Baum and Anthony took a fighting stance, prompting the officers, who were not in uniform, to identify themselves and order the men to the ground. According to plaintiff, the officers used force when Baum and Anthony refused to comply and enticed an unidentified companion in the garage to retrieve a firearm for them from inside the house. Jeffrey arrived moments later and his involvement was limited to providing handcuffs to Jacquemain and assisting Schmittler in freeing Baum's arms in order to handcuff him. Thereafter, Macomb sheriff's deputies arrived and arrested Anthony on charges of assault, malicious destruction of property,[2] and disturbing the peace. Officers arrested Baum on a charge of disturbing the peace in connection with his conduct at the Walsh house.[3]

On July 28, 2011, Baum and Anthony filed a complaint in the underlying federal action and painted a much different sequence of events than did plaintiff in the present case. They alleged that Jeffrey was angry at Baum after Baum contacted Beth and that he had an "agenda to bring harm to Baum." The complaint accused Jeffrey of acting "on his own personal agenda and

---

[2] Anthony allegedly kicked out the back of a deputy's car.

[3] Anthony eventually pleaded guilty to assaulting a police officer. It does not appear that Baum was ever convicted of an offense.

rage" when he went to Baum's home along with Schmittler and Jacquemain. According to the underlying complaint, Baum and Anthony complied with officers' commands when they were ordered to the ground and, despite this compliance, the officers proceeded to administer a fierce beating on Baum and Anthony that caused injuries. The complaint alleged that the officers told Baum and Anthony "that they intended to kill them."

Baum and Anthony alleged eight claims in the underlying complaint against Jeffrey, Schmittler, and Jacquemain, including: (1) excessive force and/or assault and battery; (2) because the officers were acting "under color of state law," a violation of 42 USC 1983; (3) a violation of 42 USC 1988, which permits the recovery of attorney fees in a § 1983 action; (4) false arrest; (5) false imprisonment; (6) violation of their Fourth Amendment rights; (7) violation of their Eighth Amendment rights; and (8) violation of their Fourteenth Amendment rights.

Plaintiff submitted a claim to defendant, together with a copy of the underlying complaint, and sought to have defendant defend the officers. Defendant denied the claim on the ground that the "four corners of the complaint" indicated that the officers were acting outside their authority as police officers during the incident involving Baum and Anthony. Plaintiff defended the underlying action and ultimately settled the case at the conclusion of the liability portion of the trial "for a sum in excess of $25,000." After the settlement, plaintiff again requested from defendant the costs associated with its defense and settlement, and defendant again refused.

After defendant's multiple denials of coverage, plaintiff initiated the present action by filing a three-count complaint against defendant alleging (1) breach of contract for defendant's alleged failure to honor its obligations under the parties' insurance policy and (2) violation of the Michigan Uniform Trade Practices Act,[4] and seeking (3) declaratory relief. According to plaintiff, it incurred $446,290.36 in damages in defending and settling the underlying action. Plaintiff asked the trial court to (1) declare that defendant was required to provide coverage for the claims alleged in the underlying action pursuant to the parties' insurance policy, (2) order defendant specifically to perform its obligations under the policy, and (3) reimburse plaintiff for the monies spent in the underlying action.

Plaintiff moved for summary disposition under MCR 2.116(C)(9) and (10), noting that its policy with defendant provided coverage for damages incurred from "wrongful acts" occurring during the course of "law enforcement activity," and arguing that the acts alleged in the underlying complaint fit within the coverage of the policy. Defendant responded and asked the trial court to deny the motion and instead grant summary disposition in its favor. Defendant asserted that the claims raised in the underlying complaint alleged knowing, intentional conduct based on Jeffrey's private, personal agenda and that such acts were not within the scope of legitimate "law enforcement activity" to which the policy applied. Defendant also asserted that the officers "wrongfully attacked" Baum and Anthony and that an exclusion in the policy excluded coverage for "dishonest, malicious, fraudulent or criminal acts," or acts taken in knowing violation of any law, statute, or governmental regulation. The trial court, after

---

[4] Plaintiff voluntarily dismissed this count.

-3-

conducting an extensive examination of the insurance policy at issue, and then comparing the present case to *Wilcox v Munger*, unpublished opinion per curiam of the Court of Appeals, issued December 20, 2007 (Docket No. 275329, issued December 20, 2007), concluded that the policy provided coverage for acts committed by police officers in the course of their law enforcement duties and that defendant could not assert that the excessive use of force, an act presumably outside the scope of those duties, was outside the scope of coverage under the policy. Thus, the trial court granted summary disposition in favor of plaintiff, finding that defendant had a duty to defend in the underlying action.

## II. STANDARD OF REVIEW

This Court reviews summary disposition rulings de novo. *Kincaid v Cardwell*, 300 Mich App 513, 522; 834 NW2d 122 (2013). A motion under MCR 2.116(C)(10) tests the factual sufficiency of a complaint. *Wilson v Alpena Co Rd Comm*, 474 Mich 161, 166; 713 NW2d 717 (2006). In deciding a summary disposition motion under MCR 2.116(C)(10), this Court considers all the evidence, affidavits, pleadings, admissions, and other information available in the record in a light most favorable to the nonmoving party. *Rice v Auto Club Ins Ass'n*, 252 Mich App 25, 30–31; 651 NW2d 188 (2002). Summary disposition should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Babula v Robertson,* 212 Mich App 45, 48; 536 NW2d 834 (1995). This Court also reviews de novo the proper interpretation and application of an insurance policy. *Grosse Pointe Park v Mich Muni Liability & Prop Pool*, 473 Mich 188, 196; 702 NW2d 106 (2005).

## III. THE INSURANCE POLICY

Defendant issued plaintiff an insurance policy that provided, among other types of coverage, "Law Enforcement Liability Coverage." The pertinent policy language stated that defendant agreed to "pay those sums that the insured [plaintiff] becomes legally obligated to pay as 'damages' resulting from a 'wrongful act' to which this insurance applies that is committed during the course and scope of 'law enforcement activities' . . . ." The policy further stated that defendant had "the right and duty to defend" plaintiff against any suit seeking damages; however, defendant had "no duty to defend [plaintiff] against any 'suit' seeking 'damages' for a 'wrongful act' to which this insurance does not apply." The policy specified that it applied to a claim for damages arising out of a "wrongful act" "committed anywhere in the world."

Two key terms in the policy—"law enforcement activities" and "wrongful act"—are expressly defined in the policy. The policy defines "law enforcement activities" to mean, in pertinent part, "administration of the criminal justice system and/or any act, error or omission of your law enforcement agency, its officials, officers, 'employees' or volunteers." "Wrongful act" means:

> any act, error or omission flowing from or originating out of a "law enforcement activity". All acts, errors or omissions, committed by one or more insureds that are substantially the same or are in any way directly or indirectly related—either logically, causally, or temporally—shall be deemed to constitute one "wrongful act" regardless of the number of claims or claimants.

The policy also contained an exclusion for any claim arising out of: (1) "a dishonest, malicious, fraudulent or criminal act, error or omission by any person, including actual or threatened acts of sexual abuse or molestation," or (2) "a knowing violation of any law, statute or governmental regulation."

## III. CONSTRUCTION AND INTERPRETATION OF THE POLICY

An insurance policy is similar to any other contractual agreement and the court's role is to "determine what the agreement was and to effectuate the intent of the parties." *Auto-Owners Ins Co v Churchman*, 440 Mich 560, 566; 489 NW2d 431 (1992). A two-part test is employed to determine the parties' intent. *Heniser v Frankenmuth Mut Ins Co*, 449 Mich 155, 172; 534 NW2d 502 (1995). "First, it must be determined whether 'the policy provides coverage to the insured,' and, second, the court must 'ascertain whether that coverage is negated by an exclusion.' " *Hunt v Drelick*, 496 Mich 366, 372-373; 852 NW2d 562 (2014), quoting *Heniser*, 449 Mich at 172 (citation and quotation marks committed). An insured bears the burden of proving that his claim falls within the terms of the policy, and an insurer bears the burden of proving that one of the policy's exclusions apply. *Auto Owners Ins Co v Seils*, ___ Mich App ___, ___; ___ NW2d ___ (Docket Nos. 315891, 315901, 316511, issued March 26, 2015, slip op p 7). Exclusionary clauses are strictly construed in favor of the insured. *Id*. Interpretation of insurance policy terms follows Michigan's established principles of contract construction. *Henderson v State Farm Fire & Cas Co*, 460 Mich 348, 353; 596 NW2d 190 (1999). "First, an insurance contract must be enforced in accordance with its terms. A court must not hold an insurance company liable for a risk that it did not assume. Second, a court should not create ambiguity in an insurance policy where the terms of the contract are clear and precise. Thus, the terms of a contract must be enforced as written where there is no ambiguity." *Id.* at 354 (citations omitted).] A court must give terms "their ordinary and plain meaning if such would be apparent to a reader of the instrument." *DeFrain v State Farm Mut Auto Ins Co*, 491 Mich 359, 367; 817 NW2d 504 (2012) (quotation marks and citations omitted).

It is well-established that "an insurer has a duty to defend an insured and that such duty is not limited to meritorious suits and may even extend to actions which are groundless, false, or fraudulent, so long as the allegations against the insured even arguably come within the policy coverage." *Auto Club Group Ins Co v Burchell*, 249 Mich App 468, 480–481; 642 NW2d 406 (2001) (citations omitted). "The duty to defend and indemnify is not based solely on the terminology used in the pleadings in the underlying action. The court must also focus on the cause of the injury to determine whether coverage exists." *Fitch v State Farm Fire and Cas Co*, 211 Mich App 468, 471; 536 NW2d 273 (1995).

The law enforcement liability policy provided coverage for damages resulting from a "wrongful act" committed during the course and scope of "law enforcement activities." The policy defines "wrongful act" as an act, error or omission flowing from or originating out of a "law enforcement activity." The policy in turn describes "law enforcement activity" as administration of the criminal justice system and/or any act, error, or omission of your law enforcement agency, its officials, officers, "employees" or volunteers. Thus, the coverage under the policy is for damages resulting from a wrongful act committed during the policy period while conducting law enforcement activities.

At issue in this case is whether the officers were conducting law enforcement activities when they committed the alleged wrongful acts such that plaintiff was entitled to a defense or coverage from defendant in the underlying action. According to defendant, the officers were not engaged in law enforcement activity because they were acting pursuant to their own "private" agenda at the time they committed the alleged wrongful acts.

The trial court found the present case to be substantially similar to *Wilcox*. In *Wilcox*, several police officers responded to a report of slashed tires. After the officers arrived at the scene, one of the officers allegedly sexually assaulted the plaintiff. The plaintiff subsequently filed a civil rights lawsuit under 42 USC 1983 against the officer's estate. The officer was covered by an insurance policy issued by the defendant, but the defendant denied during the federal action that any coverage was available. The plaintiff brought suit seeking a declaration that the insurer had liability under the policy and that coverage under the policy applied to the officer's actions. The insurer filed a cross-claim seeking a declaration that it had no obligation to indemnify or defend with respect to the officer's actions because, inter alia, the officer's action fell within a policy exclusion. The trial court granted summary disposition in favor of the insurer on the ground that sexual assault is not within an officer's official duties, and because the acts of police officers in the ambit of their personal, private pursuits fall outside of 42 USC 1983, the officer was not a member of the group of persons afforded coverage by the insurer. The policy at issue defined "member" as a municipal corporation as well as "any former or present employee 'while acting within the scope of their official duties or operations on behalf of the Member.'" At issue in *Wilcox* was whether the officer was acting within the scope of his official duties or operations on behalf of the insured police department when he allegedly sexually assaulted the plaintiff such that his estate was entitled to a defense or coverage from the insurer in the federal lawsuit.

This Court explained the insurer's[5] argument in *Wilcox*:

> According to defendant, summary disposition was appropriate because Heika [the officer] was acting outside the scope of his employment when he committed the alleged sexual assault. Defendant contends that the sexual assault was not authorized or ratified by his employer, and that by committing the act, Heika had stepped outside of his official duties to satisfy a personal desire. Defendant does not dispute that Heika was present at plaintiff's home as a fully

---

[5] This Court recognized the defendant Michigan Municipal Risk Management Authority's assertion that it was not an insurer and that the coverage documents were not an insurance policy and concluded that:

> The similarities between the purpose and content of defendant's coverage documents and traditional insurance policies, however, coupled with the fact that this matter is solely concerned with a dispute over the terms of the coverage documents leads us to conclude that the most appropriate analysis would be the same as that given disputes over insurance policy language. [*Id.* at slip op p 3 n 1.]

uniformed and armed police officer responding to a call, and that his initial presence would be within the scope of his duties as a police officer. Heika then entered plaintiff's home to either give her some paperwork or wait for her to retrieve paperwork relating to the incident for which Heika had been initially called to the home. Clearly, but for Heika's status as a police officer and his response to a call as part of his official duties, he would not have gone inside plaintiff's home. Nevertheless, defendant contends that when Heika committed the sexual assault, he temporarily took off his police officer hat, figuratively speaking, and at the singular moment of the sexual assault, was not acting within the scope of his duties. [*Id.* at slip op p 3.]

This Court then opined:

>The problem this Court sees with this rationale finds its basis in the very language of the coverage documents. On the one hand, the documents purport to provide coverage for claims against an employee seeking damages for personal injury (including constitutional and civil rights violations) or wrongful acts so long as the employee is acting within the scope of his employment duties. On the other hand, defendant encourages a reading of the coverage documents that would exclude coverage *because* Heika's actions could be categorized as causing personal injury (or a wrongful act). Per the coverage documents, Heika is afforded coverage for the claim of sexual assault (wrongful act) committed while he was acting within the scope of his employment, yet by virtue of committing the personal injury (or wrongful act) action, is deemed to have not been acting with[in] the scope of his employment. This language is ambiguous, indeed, circular, and leaves this Court to ponder when causing personal injury or committing a wrongful act would be part of one's employment duties or fall within the scope of one's employment such that he would be afforded coverage for claims alleging a wrongful act.

>The language, as written could always allow for the carving out of a complained of specific act and categorize it as outside of one's official employment duties. For example, one could argue that an officer's action in pulling a vehicle over would be within the scope of his employment. But, if it is alleged that he pulled the vehicle over because of some racial basis, defendant could always separate the specific action alleged to be wrongful (or violative of constitutional or civil rights) and claim that the narrow action complained of (using racial bias as a basis for pulling over a vehicle) fell outside the scope of employment (discrimination presumably never falling within the scope of one's employment duties) and that coverage was not available. [*Id.* at slip op pp 3-4.]

This Court then applied the "rule of pro con proferentum" and resolved the ambiguity in the coverage documents against the defendant as the drafter of the documents. [*Id.* at slip op p 4.] This Court also took note of the duty to defend if the underlying allegation "even arguably" comes within the policy coverage. *Id.* See also *Auto Club Group Ins Co*, 249 Mich App at 480-481. The trial court found the present case similar to *Wilcox* and ruled accordingly:

In this case, as in *Wilcox*, the Policy provides that it covers wrongful acts committed by a police officer in the course of his/her "law enforcement activities". However, Defendant would, as the defendant in *Wilcox* did, argue that any wrongful act was outside of the officer's law enforcement activities and therefore not covered. As the Court of Appeals held in *Wilcox*, this Court is convinced that the language of the policy is ambiguous and circular. Further, as in *Wilcox*, this Court is satisfied that the policy must be construed against the drafting party, i.e. Defendant. Consequently, the Court is convinced that summary disposition must be granted in favor of Plaintiff on the grounds that Defendant had a duty to defend the lawsuit.

Although *Wilcox* is not precedentially binding because it is an unpublished opinion, MCR 7.215(C)(1), this Court can look to the case for its instructive or persuasive value, *Paris Meadows, LLC v Kentwood*, 287 Mich App 136, 145 n 3; 783 NW2d 133 (2010).

Here, the underlying complaint alleged violations of 42 USC 1983, which allows a party to file an action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' because of the actions of another person acting 'under color of any statute, ordinance, regulation, custom, or usage, of any State.'" *Moore v Detroit Entertainment, LLC*, 279 Mich App 195, 202; 755 NW2d 686 (2008). To establish a right to relief under 42 USC 1983, a plaintiff must plead and prove: (1) that he or she has been deprived of a right secured by the Constitution and laws of the United States; and (2) that the defendants deprived him or her of this right while acting under color of law. *Ritter v Wayne Co Gen Hosp*, 174 Mich App 490, 497; 436 NW2d 673 (1988). The claim necessarily involves violations of the plaintiff's rights while the defendants are acting under color of state law – i.e., as police officers in the performance of their duties. Defendant conceded in its response to plaintiff's motion for summary disposition that "it appears to have been undisputed in the 'underlying claim' that Officers Walsh, Schmittler and Jacquemain were on duty at the time of the incident in question." Plaintiff presented extrinsic evidence that the officers were authorized by their commanding officers to respond to the incident at the Walsh home. When Sgt. Schmittler and Det. Jacquemain were informed that Baum had left the Walsh home but had threatened to return, they advised dispatch that they intended to instead go to the nearby Baum residence. On arrival at the Baum residence, Schmittler and Jacquemain observed conduct that they believed necessitated the detention of Baum and Pellegrino. They identified themselves as police officers before ordering the men to lie on the ground. Jeffrey, who observed Schmittler and Jacquemain struggling with Baum and Pellegrino, stopped to assist the officers in handcuffing Baum. The evidence supports that the officers were engaged in law enforcement activity, as that term is defined in the policy, at the time they committed the alleged wrongful acts.

Despite this evidence, defendant contends, as did the defendant in *Wilcox*, that the officers were not engaged in law enforcement activity because they were acting on a personal agenda and acting intentionally when they committed the wrongful acts. The policy's definition of "wrongful act" includes "*any* act, error or omission flowing from or originating out of a law enforcement activity" (emphasis added). To contend, as does defendant, that the alleged wrongful acts are not covered under the policy because the claimants alleged "knowing, intentional, and purposeful acts" that do not constitute "negligence, mistake or error" is

-8-

misplaced, as the policy does not limit the definition of wrongful acts to acts performed negligently or mistakenly.[6] Rather, the policy provides coverage for *any* wrongful act committed during the course and scope of law enforcement activities. And because the claims arguably fell within the policy coverage, the duty to defend was triggered. *Auto Club Group Ins Co*, 249 Mich App at 480-481.

With respect to the purported exclusion in the policy, defendant states that "[i]t is expected that there will be some argument that the Defendant Police Officers, in fact, committed no 'dishonest, malicious, fraudulent or criminal act, error or omission' or 'knowing violation of any law, statute or governmental regulation' " Defendant does not develop this argument in the context of the present case, but rather, compares the exclusion to an insured's claim of self-defense in assault and battery cases in asserting that it had no duty to defend. But the underlying claim did not involve any claim of dishonesty or criminal conduct. Rather, the claimants alleged a violation of 42 USC 1983 by officers who allegedly violated police procedures by unlawfully detaining and arresting the claimants using excessive force. To properly plead a claim of police misconduct or a violation of § 1983, the claimant must assert unlawful conduct outside the scope of accepted or reasonable police procedure that had the effect of depriving him or her of a constitutional right. Thus, unlawful conduct is the basis of any claim that arises out of a law enforcement activity. Similar to *Wilcox*, where the policy purports to afford coverage for wrongful acts that occur during law enforcement activity (i.e., claims under 42 USC 1983 involving unlawful conduct), such conduct is the risk that the insurance company assumed. Inasmuch as exclusionary clauses in contracts are construed against the drafter, and given that defendant has not fully developed this argument, defendant has failed to demonstrate that the exclusion applies.

Affirmed.

/s/ David H. Sawyer
/s/ Jane M. Beckering
/s/ Mark T. Boonstra

---

[6] It appears that the claimants alleged that the officers acted intentionally because the claim is against a governmental unit and, therefore, the claimants had to plead facts in avoidance of governmental immunity to state an actionable claim. *Butler v Wayne Co Sheriff's Dep't*, 75 Mich App 202, 203; 255 NW2d 7 (1977).