*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

ROBIN HARKRADER,

        Plaintiff-Appellant,

UNPUBLISHED
October 29, 2020

v

SHELDON HAYES and B & M ASHMAN, INC.,

        Defendants-Appellees.

No. 345950
Wayne Circuit Court
LC No. 16-000912-NI

Before: TUKEL, P.J., and SERVITTO and BECKERING, JJ.

PER CURIAM.

In this action for third-party economic and noneconomic damages under the no-fault act, MCL 500.3101 *et seq.*, plaintiff appeals as of right the trial court's judgment on a jury trial verdict finding that plaintiff was entitled to $25,575 of excess economic damages from defendants, Sheldon Hayes and B & M Ashman, Inc., but had not suffered a threshold injury to be entitled to noneconomic damages. We affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff was driving her Cadillac Escalade to Saugatuck for a weekend getaway when she noticed that her husband, Ronald Harkrader, who had been driving in front of her, had pulled off to the shoulder. Plaintiff did similarly when she noticed a Ford F-350 pickup truck veering into her lane from oncoming traffic. Hayes was driving the F-350 at the time, in the course of his employment with B & M Ashman. Hayes had veered into oncoming traffic because a metal spool with tubing wrapped around it had fallen off of the trailer he was pulling and was rolling down the road. Hayes attempted to keep his vehicle in front of the eight-foot-tall, four-foot-wide, 2,000-pound spool. Eventually, however, Hayes stopped his truck in an attempt to stop the spool from entering a major intersection. The spool struck Hayes's trailer, ricocheted off of it, and then crashed into the driver's-side of plaintiff's Escalade.

Plaintiff did not receive medical care at the scene of the accident and, after the crash, continued on to Saugatuck for her planned weekend getaway.[1]  Eventually, plaintiff claimed that she began to suffer significant back and neck pain.  When plaintiff was unable to obtain an appointment with her own doctor, she contacted the Mike Morse Law Firm (MMLF).  She was referred to a chiropractor by the MMLF, whom she saw the following day.  After a magnetic resonance imaging (MRI) study showed a herniated disc at L5-S1, the chiropractor referred plaintiff to Dr. Martin Kornblum, an orthopedic surgeon.  When conservative treatment failed to reduce plaintiff's pain, she agreed with Dr. Kornblum's recommendation for a discectomy and spinal fusion.  Although Dr. Kornblum believed that the surgery was successful, plaintiff continued to report pain and an inability to return to work or her normal, pre-accident life.  Eventually, plaintiff developed a hernia at the incision where Dr. Kornblum performed the spinal surgery, leading to another surgery, a hernia repair.

Plaintiff sued defendants for excess economic damages based on more than three years of work loss, as well as noneconomic damages.  Plaintiff alleged that defendants' negligence had caused her herniated disc, back pain, neck pain, and issues related to her hernia.  The case eventually proceeded to a jury trial.  Defendants' theory of the case was that plaintiff suffered from degenerative issues in her spine, which caused all of her alleged problems and necessitated the surgery.  Defendants also presented evidence that Dr. Kornblum and the MMLF had a relationship involving referrals.  The jury found that plaintiff was injured in the accident and entitled to excess economic damages, but that she had not suffered a threshold injury that would have allowed her to collect noneconomic damages.  After the trial court entered judgment on the jury verdict, plaintiff moved for a new trial.  The trial court denied that motion and this appeal followed.

## II.  EXPERT IN BIOMECHANICS

Plaintiff argues that the trial court abused its discretion by allowing Anna Barbir, Ph.D., to testify as an expert in biomechanics because she did not have a sufficient factual understanding of the case and was not a medical doctor.  We disagree.

## A.  STANDARD OF REVIEW

"A trial court's evidentiary decisions, preserved for review, are reviewed for an abuse of discretion." *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 541; 854 NW2d 152 (2014).  "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes."  *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010).  "We review de novo questions of law underlying evidentiary rulings, including the interpretation of statutes and court rules." *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016).  Finally, "[t]he admission or exclusion of evidence because of an erroneous interpretation of law is necessarily an abuse of discretion." *Id*.

---

[1] The crash occurred on a Friday.

B.  APPLICABLE LAW

In Michigan, MRE 702 and MCL 600.2955 govern the admissibility of expert scientific testimony.  MRE 702 sets out the requirements for the admission of expert testimony, and provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under MRE 702, the trial court must function as a gatekeeper in making decisions regarding the admissibility of scientific evidence and ensuring that expert testimony meets that rule's standard of reliability.  *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004), citing *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).  In addition, MCL 600.2955 provides:

> (1) In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact.  In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

> > (a) Whether the opinion and its basis have been subjected to scientific testing and replication.

> > (b) Whether the opinion and its basis have been subjected to peer review publication.

> > (c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

> > (d) The known or potential error rate of the opinion and its basis.

> > (e) The degree to which the opinion and its basis are generally accepted within the relevant expert community.  As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

> > (f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

In determining the admissibility of expert testimony, the trial court "shall consider all of the factors listed in MCL 600.2955(1)." *Clerc v Chippewa Co War Mem Hosp*, 477 Mich 1067, 1068; 729 NW2d 221 (2007) (quotation marks omitted). The party offering the expert testimony has the burden of satisfying the preconditions established by MRE 702 and MCL 600.2955(1). *Gilbert*, 470 Mich at 781. A court must consider all of the statutory factors in making the admissibility ruling, but evidence may be admitted even if some of the factors do not support admissibility. Rather, the pertinent determination is whether a scientific opinion "is rationally derived from a sound foundation." *Chapin v A & L Parts*, *Inc*, 274 Mich App 122, 127; 732 NW2d 578 (2007); *id*. at 143 (METER, J., concurring). "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 US at 595.

## C. ANALYSIS

As noted, plaintiff's first argument is that Barbir should have been precluded from testifying because she did not have a sufficient understanding of the factual circumstances of the case to provide a reliable expert opinion. Plaintiff is correct that "an expert opinion based upon only hypothetical situations is not" permitted. *Teal v Prasad*, 283 Mich App 384, 394; 772 NW2d 57 (2009) (quotation marks and citation omitted). But, the law does not require that an expert witness have a full understanding of every fact in a given case, only that the proponent of the expert's testimony "set forth specific facts that would support a reasonable inference of a logical sequence of cause and effect." *Id*. at 394-395 (quotation marks and citation omitted). In doing so, "[t]here must be facts in evidence to support the opinion testimony of an expert." *Id*. at 395 (quotation marks and citation omitted). During her testimony, Barbir provided the following summary of the factual basis of her opinion:

> Right. Yeah. So I reviewed the crash report. I reviewed 12 photographs of the Cadillac. Repair estimates of the Cadillac. And then I believe I also reviewed a statement by Mr. Hayes.
>
> \* \* \*
>
> Yeah. So I then, I got the dimensional data for the Cadillac; for the vehicle. So basically I got the, there's a database called auto stats. Where you can get the information on the weight and the geometry of the vehicle. The height of the bumper and so on.
>
> And then I also looked through another database called NASS. Which is the National Automotive Sampling System. Which is run by NHSTA. The National Highway Transportation Safety Administration. And they, what they do is they collect data on accidents that happened everyday [sic].
>
> So they have tens of thousands of cases in there. Were [sic] they send accident reconstructionist's [sic] out. And they have them measure the vehicles. And find out information on how fast the vehicles were going. And then they have

-4-

photographs of the types of damage that that would be related. So I looked at that as well.

Barbir also informed the jury that she reviewed a summary of plaintiff's medical records and alleged injuries, and used Hayes's description of the spool to determine its dimensions. She calculated that the spool was about eight feet tall, four feet wide, and weighed between 1,000 and 2,000 pounds. Plaintiff's Escalade, on the other hand, weighed about 5,665 pounds. These were all "facts in evidence to support" Barbir's expert opinion. *Teal*, 283 Mich App at 395 (citation omitted).

During cross-examination, Barbir admitted that she had not observed plaintiff's actual medical records, had not personally observed the damage to the Escalade, and had not visited the scene of the accident. She also was not aware of the speed of the spool when it struck Hayes's trailer and had not personally inspected the spool.

Plaintiff contends that absent the cross-examination admissions, Barbir's testimony was unreliable under the requirements of MRE 702. The question we must consider is whether the facts in evidence relied on by Barbir were adequate to "support a reasonable inference of a logical sequence of cause and effect." *Teal*, 283 Mich App at 394-395 (quotation marks and citation omitted). In this case, Barbir specifically explained how her expert biomechanical opinion did not depend on any of the knowledge she lacked. Barbir testified that the primary goal of her investigation was to determine the change of speed and direction that occurred to the Escalade when it was struck by the spool. In order to determine that, it was standard for experts in biomechanics to rely on the mass of both objects, photographs of the damage, and studies applying those statistics. More specifically, Barbir opined that the photographs of the Escalade showed that it was struck by the spool in a downward direction. The damage caused and the angle of the demarcation showed that the collision happened below the middle of the car, which Barbir testifed meant that the spool had been falling over when it hit the Escalade. Thus, Barbir concluded that the change in direction was downward and toward the driver's side.

With that knowledge, Barbir also reviewed the mass of the spool and the Escalade—2,000 pounds and 5,665 pounds, respectively. Barbir explained that the important takeaway from that data was that the Escalade was significantly heavier than the spool. Given the difference in mass, the angle of the collision, the damage done to the Escalade, and studies reviewing such data, Barbir opined that the change of speed of the Escalade was, at most, five miles per hour. Barbir then reviewed studies conducted on Escalades that had been struck in the side resulting in a change of speed of eight and nine miles per hour. In those studies, the passengers in the cars were slightly injured but did not suffer herniated discs. Barbir discussed that in all of the studies reviewed, a herniated disc had never been caused by a change of speed of five miles per hour or less.

Barbir testified that she was aware that plaintiff suffered from degenerative disc disease, but that her opinion was not changed by such information. Indeed, Barbir opined that the existence of the degenerative issues actually supported her conclusion. She explained that degenerative disc disease results in the thinning of intervertebral discs, and that studies revealed that thinner discs are less likely to herniate as a result of a one-time traumatic force. In other words, because a person with degenerative disc disease has thinner intervertebral discs, he or she is less likely to herniate during an automobile accident. Thus, even in light of the prior diagnosis of degenerative

disc disease, Barbir was confident in her expert opinion that the forces involved in the collision like the one in this accident could not result in a herniated disc in the lumbar spine.

After describing the process used to reach her expert opinion, Barbir made clear that certain information challenged by plaintiff was irrelevant to her calculations. In particular, the speed of the spool when hitting Hayes's trailer was irrelevant, because Barbir could calculate the change of speed and direction of the Escalade without that information. Further, Barbir testified that using photographs to estimate the damage done to a given vehicle is a well-accepted procedure in the field of biomechanics. Stated differently, actually viewing the scene of the accident or the damage to the vehicle in person was not necessary for the validity of her conclusions. Because she was not discussing plaintiff's specific diagnoses, Barbir also was not concerned with her lack of access to plaintiff's actual medical records. Barbir explained that it was enough for her to know of plaintiff's history of degenerative disc disease and her claimed injury.

Plaintiff's second argument is that the trial court erred in permitting Barbir to provide expert testimony because she was not a medical doctor. Plaintiff is correct that an expert in biomechanics is not permitted to testify regarding medical causation of a specific injury for a specific person. See *Gilbert*, 470 Mich at 789 ("Where the subject of the proffered testimony is far beyond the scope of an individual's expertise—for example, where a party offers an expert in economics to testify about biochemistry—that testimony is inadmissible under MRE 702."). Indeed, in *Gilbert*, our Supreme Court held that a social worker was precluded from testifying about an individual's medical prognosis, reasoning that "[t]he medical 'prognosis' of a social worker who has no training in medicine and lacks any demonstrated ability to interpret medical records meaningfully is of little assistance to the trier of fact." *Id*. at 789-790. However, as the trial court correctly noted, a biomechanics expert *is* permitted to testify about whether certain forces, when applied to the human body, could result in certain injuries. That is, after all, well within "the scope of [Barbir's] expertise." *Id*. at 789. As discussed, Barbir's testimony was properly limited in this regard. Specifically, Barbir testified that the force of the spool resulted in a change of speed and direction to the Escalade that would not have caused a herniated disc. Importantly, Barbir did not testify that plaintiff did not actually suffer a herniated disc or provide a medical diagnosis. The general, nonmedical nature of Barbir's testimony was admissible. All of the caselaw cited by plaintiff involves an expert in biomechanics testifying about medical diagnoses, which is not permitted and did not happen in this case. Consequently, this allegation of error by defendant is also without merit. *Id*. at 789-790.

### III. IMPROPER ADMISSION OF REBUTTAL TESTIMONY

Plaintiff argues that the trial court abused its discretion by admitting rebuttal testimony from Dr. Robert Travis. We disagree that the trial court committed error.

### A. STANDARD OF REVIEW AND APPLICABLE LAW

"Rebuttal evidence is evidence that explains, contradicts, or otherwise refutes [an opposing party's] evidence." *Sullivan Indus, Inc v Double Seal Glass Co, Inc*, 192 Mich App 333, 348; 480 NW2d 623 (1991). Evidence is proper as rebuttal evidence if it is responsive to evidence introduced or theories developed in the other party's case in chief. *People v Figgures*, 451 Mich 390, 399; 547 NW2d 673 (1996). Furthermore, evidence offered during a party's case in chief is

not rebuttal evidence; rather, rebuttal evidence is evidence offered after each party has completed its case in chief. See *Winiemko v Valenti*, 203 Mich App 411, 418-419; 513 NW2d 181 (1994). "The admission of rebuttal evidence rests largely in the discretion of the trial court." *Lopez v General Motors Corp*, 224 Mich App 618, 637; 569 NW2d 861 (1997). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *Edry*, 486 Mich at 639.

"When rebuttal evidence is permitted, it must relate to a substantive matter rather than a collateral one. Generally, contradictory evidence is admissible only when it directly tends to disprove a witness' exact testimony." *Westland v Okopski*, 208 Mich App 66, 72; 527 NW2d 780 (1994) (citation omitted). "The purpose of rebuttal evidence is to undercut an opponent's case, and a party may not introduce evidence competent as part of his case in chief during rebuttal unless permitted to do so by the court." *Winiemko*, 203 Mich App at 418-419.

## B. ANALYSIS

Plaintiff's argument regarding rebuttal testimony fails because the additional testimony of Dr. Travis was not rebuttal testimony. As discussed, rebuttal testimony is meant to explain, contradict, or refute evidence offered by the opposing party during its case in chief at trial. See *Figgures*, 451 Mich at 399; *Winiemko*, 203 Mich App at 418-419. As such, evidence obtained before trial even begins by definition is not rebuttal evidence unless actually offered as rebuttal evidence at trial. See *Figgures*, 451 Mich at 399; *Winiemko*, 203 Mich App at 418-419.

Plaintiff argues that defendants should not have been permitted to depose Dr. Travis a second time before trial began. Dr. Travis was initially deposed in January 2018. At the time of Dr. Travis's January 2018 deposition, he did not have access to any images from plaintiff's MRI. Plaintiff's expert, Dr. Kornblum, was deposed in May 2018. Dr. Travis was then deposed a second time on June 18, 2018, two days before Dr. Kornblum's deposition testimony was introduced at trial. Defendants played Dr. Travis's deposition testimony at trial, during defendants' case in chief; defendants did so by introducing Dr. Travis's first deposition, and then immediately followed that by playing Dr. Travis's second deposition, all for the jury. As such, both of Dr. Travis's depositions were introduced during defendants' case in chief, which by definition is not rebuttal testimony. Consequently, the trial court did not abuse its discretion in allowing defendants to obtain the additional testimony from Dr. Travis. See *Figgures*, 451 Mich at 399; *Winiemko*, 203 Mich App at 418-419.[2]

---

[2] Moreover, even if the evidence was rebuttal testimony, the trial court did not abuse its discretion in permitting it. This Court has previously held that a trial court did not abuse its discretion by permitting a party to call an expert witness as a rebuttal witness in a situation when the other party's expert witness provided his deposition testimony three weeks after the challenged rebuttal witness's first deposition. *Taylor v Blue Cross/Blue Shield of Mich*, 205 Mich App 644, 655; 517 NW2d 864 (1994). In simpler terms, the rebuttal witness was properly called when his first testimony preceded the testimony of the opposing party's expert witness. *Id*. The same situation occurred in this case. When trial purportedly was imminent in early 2018, only Dr. Travis's

Plaintiff also argues that Dr. Travis should not have been permitted to testify about the MRI image he reviewed, because he failed to review all of the MRI films. Section II of this opinion contains a lengthy discussion of the requirements of expert witness testimony, which is essentially that an expert witness's factual understanding of the case need only be sufficient to allow the expert to reach an opinion without relying on conjecture or assumptions. *Teal*, 283 Mich App 394-395. Dr. Travis testified that he reviewed a single image from plaintiff's MRI study.[3] In reviewing it, he noted that there was not a buildup of spinal fluid around the herniated disc. According to Dr. Travis, such spinal fluid would be present if the injury was caused by a traumatic force. The lack of spinal fluid, Dr. Travis opined, revealed that the herniated disc was caused by degenerative issues. Plaintiff was permitted to and did cross-examine Dr. Travis on his failure to review all of the MRI films in plaintiff's case. The jury was privy to that testimony and was provided adequate information to make an informed decision on whether to believe Dr. Travis or Dr. Kornblum. Considering Dr. Travis's explanation of his opinion, the record that has already been discussed in this case, and the law, plaintiff has failed to provide any ground supporting a conclusion that the trial court abused its discretion in permitted Dr. Travis's supplemental testimony. See *id*.

## IV. ATTORNEY MISCONDUCT

Plaintiff argues that defense counsel committed misconduct by presenting a theme of attorney-driven treatment and a scheme to make money between plaintiff's attorneys, plaintiff, and Dr. Kornblum and that defense counsel's misconduct requires reversal and a new trial. We disagree.

## A. STANDARD OF REVIEW AND APPLICABLE LAW

"We review for an abuse of discretion a trial court's general conduct of a trial," as well as a trial court's decision regarding a motion for a new trial. *Zaremba Equip, Inc v Harco Nat Ins*

---

January 28, 2018 deposition had been taken and, therefore, only that deposition would have been played for the jury. With trial being delayed until June, Dr. Kornblum's deposition for trial was not taken until May 31, 2018. Consequently, Dr. Travis's supplemental testimony, which was provided on June 18, 2018, occurred after Dr. Kornblum's deposition. Therefore, considering the reasoning provided by the panel in *Taylor*, 205 Mich App at 655, the trial court did not abuse its discretion in permitting the additional testimony. Further, Dr. Travis's additional testimony was that an MRI image, which he had not previously been provided, failed to show that plaintiff's herniated disc was the result of a traumatic injury. That testimony refuted the testimony by Dr. Kornblum that all of plaintiff's injuries were caused by the accident. Thus, in sum, the alleged rebuttal testimony was appropriately timed, *id*., and for a proper purpose—refuting Dr. Kornblum's testimony, *Winiemko*, 203 Mich App at 418-419. The trial court did not abuse its discretion.

[3] Dr. Travis based his opinion on review of a single MRI image. While he was aware that MRIs normally create many more images, sometimes even thousands of images, Dr. Travis concluded that the single image he reviewed was so clear that it was not necessary for him to review other images from plaintiff's MRI before making his conclusions.

*Co*, 302 Mich App 7, 21; 837 NW2d 686 (2013). "An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes." *Id*.

This Court and the Michigan Supreme Court have previously discussed the proper process for reviewing a claim of attorney misconduct:

> When reviewing an appeal asserting improper conduct of an attorney, the appellate court should first determine whether or not the claimed error was in fact error and, if so, whether it was harmless. If the claimed error was not harmless, the court must then ask if the error was properly preserved by objection and request for instruction or motion for mistrial. If the error is so preserved, then there is a right to appellate review; if not, the court must still make one further inquiry. It must decide whether a new trial should nevertheless be ordered because what occurred may have caused the result or played too large a part and may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted. Tainted verdicts need not be allowed to stand simply because a lawyer or judge or both failed to protect the interests of the prejudiced party by timely action. [*Badalamenti v William Beaumont Hosp-Troy*, 237 Mich App 278, 290; 602 NW2d 854 (1999) (emphasis omitted), quoting *Reetz v Kinsman Marine Transit Co*, 416 Mich 97, 102-103; 330 NW2d 638 (1982).]

"An attorney's comments do not normally constitute grounds for reversal unless they reflect a deliberate attempt to deprive the opposing party of a fair and impartial proceeding." *Zaremba Equip*, 302 Mich App at 21. "Reversal is required only where the prejudicial statements of an attorney reflect a studied purpose to inflame or prejudice a jury or deflect the jury's attention from the issues involved." *Hunt v Freeman*, 217 Mich App 92, 95; 550 NW2d 817 (1996).

An attorney is permitted to argue or suggest that a witness may not be truthful when witness credibility is a pertinent issue in the case. *Zaremba Equip*, 302 Mich App at 25-26. An attorney is also permitted to point out the potential bias of certain witnesses and to argue that "his witness speaks the truth while the other presents a fabrication." *Reetz*, 416 Mich at 108-109. "It is generally permissible to cross-examine an adverse witness as to any facts which tend to show the witness' relation with, feelings toward or bias or prejudice for either party." *US Fire Ins Co v Citizens Ins Co of America*, 156 Mich App 588, 592; 402 NW2d 11 (1986).[4] "An interested witness is one who has a pecuniary interest, having prospect of gain or loss." *Denevan v Belter*, 232 Mich 664, 668; 206 NW 500 (1925). "The interest or bias of a witness goes directly to the question of his credibility and is never regarded as irrelevant." *Backowski v Solecki*, 112 Mich App 401, 414; 316 NW2d 434 (1982). It is axiomatic that "a lawyer is expected to advocate his client's cause vigorously," but the line is crossed when improper advocacy results in an unfair

---

[4] "Although cases decided before November 1, 1990, are not binding precedent, MCR 7.215(J)(1), they nevertheless can be considered persuasive authority." *In re Stillwell Trust*, 299 Mich App 289, 299 n 1; 829 NW2d 353 (2012) (citation omitted).

trial. *Bd of Co Rd Comm'rs of Wayne Co v GLS LeasCo, Inc*, 394 Mich 126, 131; 229 NW2d 797 (1975).

## B. ANALYSIS

We must first address the allegations of wrongdoing alleged by plaintiff. Plaintiff's primary concern is that defense counsel repeatedly discussed a connection between the MMLF, plaintiff, and Dr. Kornblum. Plaintiff first asserts that this argument had no basis in fact, citing instances in defense counsel's closing argument where counsel asserted that plaintiff went to see Dr. Kornblum because she was referred to him by the MMLF. Plaintiff insists that this assertion by defense counsel was without any basis in fact, citing plaintiff's denial of the allegation and her husband Ronald's lack of knowledge. The record, however, does support the inference that plaintiff was referred to Dr. Kornblum by the MMLF. Plaintiff testified that she was originally told by her own doctor that she would not be able to be seen for back pain for two weeks. Plaintiff then stated that her sister recommended that plaintiff speak with the MMLF. Plaintiff followed that advice and was referred to a chiropractor by the MMLF. The chiropractor saw her the day after she was denied treatment by her own doctor. Plaintiff testified that the chiropractor, upon realizing her injury was beyond his ability to treat, referred her to Dr. Kornblum. When Ronald was asked about whether plaintiff went to Dr. Kornblum because of a referral from the MMLF, he said that he did not know but that he could not dispute that it was true.

Defendants also elicited testimony from Dr. Kornblum regarding his alleged relationship with the MMLF. Dr. Kornblum testified that he was not aware how many patients he had treated that were represented by the MMLF. Defense counsel asked whether Dr. Kornblum was aware that defense counsel's firm represented more than 40 clients in which both the MMLF and Dr. Kornblum were involved. Dr. Kornblum stated that he did not know the statistics but also that he could not deny them. Defense counsel asked Dr. Kornblum to estimate the number of patients he treated who were represented by the MMLF. Dr. Kornblum said he was not aware, but could not deny that the number could be over 300.

Considering the testimony of plaintiff, Ronald, and Dr. Kornblum, defense counsel was permitted to argue that there was a referral relationship between the MMLF and Dr. Kornblum. Although there was no direct evidence of the relationship, there was circumstantial evidence admitted supporting an inference. Most pertinent was the evidence that the chiropractor to whom plaintiff had been referred by the MMLF was the individual who then referred her to Dr. Kornblum. It was well within the permissible realm of vigorous advocacy for defense counsel to argue that plaintiff was referred to Dr. Kornblum by the MMLF. *Bd of Co Rd Comm'rs of Wayne Co,* 394 Mich at 131.

Plaintiff also claims that defense counsel's focus on the potential relationship between Dr. Kornblum, the MMLF, and plaintiff improperly persuaded the jury to find against plaintiff. It is the jury's responsibility to assess the credibility of the witnesses. See *People v Lemmon*, 456 Mich 625, 636-637; 576 NW2d 129 (1998). To the extent that evidence of a relationship between Dr. Kornblum and the MMLF suggested that the doctor may have had a pecuniary interest in the outcome of the trial, it was proper for the jury to hear that evidence. Thus, the pecuniary interests of Dr. Kornblum and plaintiff were proper subjects for the jury to consider, as those interests weighed directly on their credibility as witnesses. *Denevan*, 232 Mich at 668; *Backowski*, 112

Mich App at 414. Moreover, relying on that evidence of potential bias, defense counsel was permitted to argue that "his witness speaks the truth while the other presents a fabrication." *Reetz*, 416 Mich at 108-109. Consequently, in asking questions and making argument regarding the relationship between Dr. Kornblum, plaintiff, and the MMLF, defense counsel did not commit misconduct. *Id.*; *Zaremba Equip*, 302 Mich App at 25-26.

Additionally, even if some of defense counsel's arguments were questionable, such as his statement that Ronald testified that plaintiff went to see Dr. Kornblum on the recommendation of her attorneys, when he actually stated that he did not know why she went to see Dr. Kornblum, reversal is still not warranted. As discussed, attorney misconduct will only provide the basis for a new trial if "the prejudicial statements of an attorney reflect a studied purpose to inflame or prejudice a jury or deflect the jury's attention from the issues involved." *Hunt*, 217 Mich App at 95. That standard was not met in this case, especially considering that the jury also heard Dr. Kornblum's, plaintiff's, and Ronald's answers to the questions asked. Dr. Kornblum, in response to the various questions about his relationship with the MMLF and plaintiff, testified that he treated patients for the medical maladies they suffered, regardless of the referral source. Plaintiff testified that she was referred to Dr. Kornblum by her chiropractor, not the MMLF. And lastly, as noted, plaintiff's husband Ronald testified that he did not know the referral source, but could not dispute that it was the MMLF. In light of this evidence; the fact that the trial court instructed the jurors that the attorneys' questions and arguments are not evidence; and the rule that "[j]urors are presumed to follow their instructions, and instructions are presumed to cure most errors," *Zaremba Equip*, 302 Mich App at 25 (quotation marks and citation omitted), plaintiff has not presented any grounds for reversal in this case.

## V. INCONSISTENT JURY VERDICTS

Plaintiff argues that the jury's verdicts were irreconcilably inconsistent. She argues that under the circumstances, the trial court abused its discretion in denying her motion for a new trial. We disagree.

### A. STANDARD OF REVIEW

"This Court [] reviews for an abuse of discretion the trial court's decision to grant or deny motions for a new trial . . . ." *Rental Prop Owners Ass'n of Kent Co v Kent Co Treasurer*, 308 Mich App 498, 531; 866 NW2d 817 (2014). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *Id.* (quotation marks and citation omitted).

### B. LAW AND ANALYSIS

" 'The Michigan Supreme Court has repeatedly held that the jury's verdict must be upheld, even [if] it is arguably inconsistent, if there is an interpretation of the evidence that provides a logical explanation for the findings of the jury.' " *Moore v Detroit Entertainment, LLC*, 279 Mich App 195, 227; 755 NW2d 686 (2008) (alteration in original), quoting *Allard v State Farm Ins Co*, 271 Mich App 394, 407; 722 NW2d 268 (2006). "Furthermore, a reviewing court must make 'every attempt . . . to harmonize a jury's verdicts. Only where verdicts are so logically and legally

inconsistent that they cannot be reconciled will they be set aside.' " *Moore*, 279 Mich App at 227 (alteration in original), quoting *Allard*, 271 Mich App at 407.

This issue requires a brief review of the no-fault act. "In general, the no-fault act is designed to achieve the expeditious compensation of damages resulting from motor vehicle accidents and to minimize administrative delays and factual disputes." *Brown v Home-Owners Ins Co*, 298 Mich App 678, 685; 828 NW2d 400 (2012). "In exchange for ensuring certain and prompt recovery for economic loss, the act also limited tort liability." *McCormick v Carrier*, 487 Mich 180, 189; 795 NW2d 517 (2010), citing MCL 500.3135. One such limitation was that first-party work-loss benefits were payable only for the "loss of income from work an injured person would have performed during the first 3 years after the date of the accident if he or she had not been injured." MCL 500.3107(1)(b). Any work-loss damages extending beyond the first three years following the accident are collectible, if at all, only in a tort action against a negligent third party. MCL 500.3135(3)(c); *Brown*, 298 Mich App at 685 ("The no-fault act allows a seriously injured person to recover work-loss damages in tort arising from the ownership, use or maintenance of a motor vehicle."). In order to maintain a claim for economic damages under MCL 500.3135(3)(c), plaintiffs were required to show "actual loss of income from work [they] would have performed if [they] had not been injured—when the loss of income exceeds the daily, monthly, and three-year limitations." *Oullette v Kenealy*, 424 Mich 83, 87; 378 NW2d 470 (1985) (quotation marks omitted). Noneconomic damages, such as payment for pain and suffering, "arising out of the ownership, maintenance, or use of a qualifying motor vehicle is limited to a list of enumerated circumstances." *McCormick*, 487 Mich at 189, citing MCL 500.3135(3). Specifically, "[a] person remains subject to tort liability for noneconomic loss . . . only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." MCL 500.3135(1). The Legislature defined a "serious impairment of body function" as "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." MCL 500.3135(5).[5]

The jury in the present case determined that plaintiff was injured in the accident, and that the injury caused her to lose wages for at least some period after three years. However, the jury also found that plaintiff had not suffered a threshold injury permitting the receipt of noneconomic damages. In the simplest terms, those findings by the jury are not inconsistent. As noted, this Court "must make 'every attempt . . . to harmonize a jury's verdicts.' " *Moore*, 279 Mich App at 227, quoting *Allard*, 271 Mich App at 407. To recover economic damages, plaintiff was only required to prove that she was injured and missed work for more than three years. *Oullette*, 424 Mich at 87; MCL 500.3135(3)(c). In other words, plaintiff only had to convince the jury that she was injured in the automobile accident. *Oullette*, 424 Mich at 87. In contrast, to be permitted to obtain noneconomic damages, plaintiff was required to prove a threshold injury, which required proof of "an objectively manifested impairment . . . ." *McCormick*, 487 Mich at 195. According to our Supreme Court, such an impairment is one "that is evidenced by actual symptoms or conditions that someone other than the injured person would observe or perceive as impairing a

---

[5] MCL 500.3135(5) has since been amended and essentially codifies the test set forth in *McCormick*, 487 Mich at 195-203, for determining whether a serious impairment of body function has been incurred. See MCL 500.3135(5), as amended by 2019 PA 22.

body function." *Id*. at 196. In considering these different requirements, it is clear that the jury could have found that plaintiff was injured, but that the injury did not result in an "objectively manifested impairment." *Id*. at 195-196; MCL 500.3135(3)(c). While an injury that resulted in a requirement to miss work for more than three years certainly suggests that there is a serious injury, it was the province of the jury to determine whether such injury caused an "objectively manifested impairment." *McCormick*, 487 Mich at 195-196. Considering this Court's requirement to find any reasonable way to logically explain the jury's verdicts, the existence of this possibility renders plaintiff's argument on appeal meritless. *Moore*, 279 Mich App at 227. The trial court properly denied plaintiff's motion for a new trial on this ground. *Id*.

## VI. CONCLUSION

For the reasons stated earlier, the trial court's order denying plaintiff's motion for a new trial is affirmed. Defendants, as the prevailing parties, may tax costs pursuant to MCR 7.219.


/s/ Jonathan Tukel
/s/ Deborah A. Servitto
/s/ Jane M. Beckering